**CASE NO. 15-1536**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

JOHN DOES, #1-5; MARY DOE,

*Plaintiffs – Appellees,*

-vs-

RICHARD SNYDER, Governor of the State of Michigan; COL. KRISTE ETUE, Director of the Michigan State Police, in their official capacities,

*Defendants – Appellants.*

**On appeal from the United States District Court**
**for the Eastern District of Michigan**

---

# BRIEF OF PLAINTIFFS-APPELLEES

---

Miriam Aukerman (P63165)
American Civil Liberties Union
Fund of Michigan
1514 Wealthy St. SE, Ste 242
Grand Rapids, MI 49506
(616) 301-0640

Michael J. Steinberg (P43085)
Kary Moss (P49759)
American Civil Liberties Union
Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201
(313) 578-6824

Paul D. Reingold (P27594)
Michigan Clinical Law Program
363 Legal Building
801 Monroe Street
Ann Arbor, MI 48109
(734) 763-4319

William W. Swor (P21215)
645 Griswold Street, Ste 3060
Detroit, MI 48226
(313) 967-0200

Attorneys for Plaintiffs-Appellees

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

**Disclosure of Corporate Affiliations and Financial Interest**

Case Number: 15-1536 Case Name: *Does v. Snyder*

Name of counsel: Miriam Aukerman, Michael Steinberg, Kary Moss, Paul Reingold, William W. Swor

Pursuant to 6th Cir. R. 26.1, John Does 1-5 and Mary Doe
*Name of Party*

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

No.

CERTIFICATE OF SERVICE

I certify that on September 23, 2015 the foregoing document was served on all parties or their counsel of record through the MC/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ Miriam J. Aukerman

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... vi

STATEMENT IN SUPPORT OF ORAL ARGUMENT .......... x

JURISDICTIONAL STATEMENT .......... 1

STATEMENT OF ISSUES .......... 1

STATEMENT OF THE CASE .......... 2

I. Overview of SORA .......... 2

II. The Plaintiffs .......... 3

A. John Doe #1 .......... 3

B. John Doe #2 .......... 4

C. John Doe #3 .......... 5

D. John Doe #4 .......... 6

E. John Doe #5 .......... 8

F. Mary Doe .......... 9

G. Risk Assessments Show That the Plaintiffs Are Unlikely to Reoffend. .......... 10

III. Evidence on Geographic Exclusion Zones .......... 11

A. Exclusion Zones Severely Limit Registrants But Do Not Decrease Recidivism. .......... 11

B. Exclusion Zone Boundaries Depend on Measurement Methods. .......... 14

C. Law Enforcement Does Not Know How to Measure Exclusion Zones. .......... 17

D. Zone Boundaries Are Effectively Unknowable. .......... 18

IV. Evidence on "Loitering" .......... 19

V. Evidence on Reporting Requirements .......... 21

VI. Evidence Relevant to Strict Liability and Vagueness .......... 25

VII. Procedural History ........ 28

SUMMARY OF ARGUMENT ........ 29

STANDARD OF REVIEW ........ 30

ARGUMENT ........ 30

I. The Constitution Requires People to Know, or Have Reason to Know, That Their Conduct is Illegal Before Criminal Liability May be Imposed. ........ 30

A. The Constitution Requires Fair Notice Before Imposing Criminal Responsibility. ........ 30

B. SORA Must Meet a Heightened Standard for Clarity and Notice. ........ 31

C. Statutes That Do Not Provide Clear Guidance to the Public or Law Enforcement Are Void for Vagueness. ........ 33

II. The District Court Correctly Held that the Exclusion Zones Are Unconstitutionally Vague. ........ 35

A. SORA Does Not Provide Clear Notice to Registrants or Adequate Guidance to Law Enforcement About How to Measure Exclusion Zones. ........ 36

B. Neither Registrants Nor Law Enforcement Have the Data and Tools Needed to Identify Exclusion Zones. ........ 38

C. Appellants' Counter-Arguments Are Unavailing. ........ 40

III. The District Court Correctly Held that the "Loitering" Prohibition is Unconstitutionally Vague. ........ 45

IV. The District Court Correctly Held that Certain Reporting Provisions Are Unconstitutional. ........ 47

V. The District Court Correctly Held that SORA Cannot Make Registrants Strictly Liable for Innocent Conduct. ........ 50

A. Because Appellants Failed to Address Strict Liability Below, They Cannot Do So Now. ........ 50

B. SORA's Strict Liability Provisions Violate Due Process Because They Impose Harsh Penalties for Innocent Conduct. ........ 50

C. Appellants' Counter-Arguments Are Unavailing. ..................................56

VI. SORA's Unconstitutionally Vague Provisions Are Facially Invalid. ...........62

CONCLUSION .......................................................................................65

CERTIFICATE OF COMPLIANCE ..........................................................66

CERTIFICATE OF SERVICE .................................................................66

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS .............67

INDEX OF EXHIBITS

A. Michigan Sex Offender Registration Act, M.C.L. § 28.721 *et. seq.*

B. Ira Ellman, *The Supreme Court's Crucial Mistake About Sex Crimes Statistics*, Casetext (July 28, 2015)

# TABLE OF AUTHORITIES

## Cases


*84 Video/Newsstand, Inc. v. Sartini*, 455 Fed. App'x 541 (6th Cir. 2011).............49

*84 Video/Newsstand, Inc. v. Sartini*, No. 1:07-cv-3190, 2007 WL 3047207 (N.D. Ohio Oct. 18, 2007)............49

*Anderson v. City of Bessemer City,* 470 U.S. 564 (1985)............30

*Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745 (6th Cir. 2005)............50

*Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553 (6th Cir. 1999)............32, 37, 47

*City of Chicago v. Morales*, 527 U.S. 41 (1999)............42, 64

*Colautti v. Franklin*, 439 U.S. 379 (1979)............32, 51

*Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101 (6th Cir. 1995)............33

*Connally v. General Construction Co.*, 269 U.S. 385 (1926)............33, 34

*Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278 (1961)............34

*Cunney v. Board of Trustees*, 660 F.3d 612 (2d Cir. 2011)............38

*Déjà Vu of Nashville, Inc. v. Metro. Government of Nashville & Davidson County*, 466 F.3d 391 (6th Cir. 2006)............49

*Doe v. Miller*, 405 F.3d 700 (8th Cir. 2005)............43

*Elonis v. United States*, 135 S.Ct. 2001 (2015)............46, 53, 58

*Forbes v. Napolitano*, 236 F.3d 1009 (9th Cir. 2000)............48

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)............31, 34

*J.C. Wyckoff & Associates, Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474 (6th Cir. 1991)............50

*Johnson v. United States*, 135 S.Ct. 2551 (2015)............33, 63, 64

*Klein v. San Diego County*, 463 F.3d 1029 (9th Cir. 2006)............44

*Kolender v. Lawson*, 461 U.S. 352 (1983)............passim

*Lambert v. California*, 355 U.S. 225 (1957)............30, 31, 52, 57

*Legg v. Chopra*, 286 F.3d 286 (6th Cir. 2002)............50

*Liparota v. United States*, 471 U.S. 419 (1985)............passim

*Mann v. State*, 603 S.E.2d 283 (Ga. 2004) ....................45

*McBoyle v. United States*, 283 U.S. 25 (1931) ....................31

*Morissette v. United States*, 342 U.S. 246 (1952) .................... 30, 50, 55, 57

*Patterson v. New York*, 432 U.S. 197 (1977)....................61

*People v. Conti*, 27 Misc.3d 453 (N.Y. City Ct. 2010) ....................45

*People v. Delong*, 128 Mich.App. 1 (1983)....................56

*People v. Lopez*, 140 P.3d 106 (Colo. App. 2005) ....................59

*People v. McFall*, __ N.W.2d __, 2015 WL 966039 (Mich. Ct. App. 2015)..........57

*Peoples Rights Organization v. City of Columbus*, 152 F.3d 522
(6th Cir. 1998) ....................32

*Smith v California*, 361 U.S. 147 (1959) ....................54

*Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250
(6th Cir. 1994) .................... 32, 63, 64, 65

*Stanley v. Turner*, 6 F.3d 399 (6th Cir. 1993).................... 51, 52

*Staples v. United States*, 511 U.S. 600 (1994).................... 51, 55

*State v. Garcia*, 752 P.2d 34 (Ariz. Ct. App. Div. 1 1987)....................59

*State v. Giorgetti*, 868 So. 2d 512 (Fla. 2004)....................59

*State v. Knowels* 643 N.W.2d 20 (N.D. 2002)....................60

*State v. Young*, 535 S.E.2d 380 (N.C. App. 2000)....................59

*United States v. Apollo Energies, Inc.*, 611 F.3d 679 (10th Cir. 2010)..................52

*United States v. Caseer*, 399 F.3d 830 (6th Cir. 2005)....................39

*United States v. Freed*, 401 U.S. 601 (1971)....................51

*United States v. Krumrei*, 258 F.3d 535 (6th Cir. 2002) ....................64

*United States v. Nieves-Casano*, 480 F.3d 597 (1st Cir. 2007) .................... 43, 44

*United States v. Santos*, 553 U.S. 507 (2008)....................42

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978)....................51

*United States v. Wulff*, 758 F.2d 1121 (6th Cir. 1985) .................... 51, 56, 57

*United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994).................... 54, 58

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) .......... 31, 32, 55

**Statutes**

28 U.S.C. § 1292(a)(1) .......... 1

42 U.S.C. § 16901 .......... 2

M.C.L. § 28.722 .......... 3

M.C.L. § 28.722(w)(ii) .......... 3

M.C.L. § 28.722(w)(iv) .......... 5, 6

M.C.L. § 28.723 .......... 3

M.C.L. § 28.723(1)(e) .......... 8

M.C.L. § 28.724a .......... 22, 53

M.C.L. § 28.725 .......... 53

M.C.L. § 28.725(1) .......... 22

M.C.L. § 28.725(1)(g) .......... 47

M.C.L. § 28.725a .......... 22, 32, 53

M.C.L. § 28.725a(8) .......... 22

M.C.L. § 28.727 .......... 22, 53

M.C.L. § 28.727(1)(f) .......... 48

M.C.L. § 28.727(1)(h) .......... 47, 49

M.C.L. § 28.727(1)(i) .......... 48

M.C.L. § 28.727(1)(j) .......... 47

M.C.L. § 28.728(c)(14) .......... 5, 6

M.C.L. § 28.728a(1)(d) .......... 27

M.C.L. § 28.733 .......... 11

M.C.L. § 28.733(b) .......... 19, 45, 46

M.C.L. § 28.733(e) .......... 11, 36, 37

M.C.L. § 28.733(f) .......... 11, 36

M.C.L. § 28.734 .......... 11, 35, 53, 57

M.C.L. § 28.735 .......................................................................... 11, 35, 53

M.C.L. § 761.1(g) ..........................................................................................56

M.C.L. § 762.11 ...............................................................................................4

**Other Authorities**

Ira Ellman, *The Supreme Court's Crucial Mistake About Sex Crimes Statistics*, Casetext (July 28, 2015)..................................................................60

Sayre, Public Welfare Offenses, 33 Colum.L.Rev. 55 (1933) ................................55

**Rules**

Fed.R.Civ.P. 52(a)(6)........................................................................................30

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiffs-Appellees request oral argument because Michigan's Sex Offender Registration Act affects tens of thousands of state residents, making a ruling on its constitutionality of significant interest to registrants, law enforcement, and the public. Oral argument will also be useful to the Court given the extensive record compiled by the parties below.

## JURISDICTIONAL STATEMENT

Under 28 U.S.C. §1292(a)(1), this Court has jurisdiction to review the district court's interlocutory order granting an injunction to Plaintiffs.

## STATEMENT OF ISSUES

1. Did the district court correctly hold that Michigan's Sex Offender Registration Act (SORA)[1] is unconstitutionally vague with respect to:

    a. SORA's geographic exclusion zones, which bar registrants from living, working or "loitering" within extensive unmarked areas, where the boundaries of those areas are unknown?

    b. SORA's criminalization of "loitering," where neither registrants nor law enforcement know what conduct constitutes "loitering"?

    c. SORA's reporting requirements that turn on the meaning of "regularly" or "routinely," where neither registrants nor law enforcement know how frequent activity must be to trigger reporting?

2. Did the district court correctly hold that registrants cannot be held strictly liable for non-intentional violations of SORA given that these violations do not involve inherently criminal acts, SORA imposes significant penalties, and SORA's provisions are so numerous, vague, and complex that even well-intentioned registrants cannot understand their obligations?

    Plaintiffs-Appellees say "yes."

    Defendants-Appellants say "no."

[1] The most recent iteration of SORA is attached as Exhibit A.

## STATEMENT OF THE CASE

### I. Overview of SORA

In 1994, when Michigan first created its sex offender registry, the registry was a private law-enforcement-only database. There were no regular reporting requirements. Most registrants were listed in the database for twenty-five years. Joint Statement of Facts (JSOF) ¶¶4-7, Doc. 90, Pg.ID# 3730.

Between 1994 and 2010, the legislature repeatedly amended SORA, transforming it into a system of supervision that affects almost every aspect of registrants' lives. Registrants were required to report an ever-expanding list of information and to appear in person quarterly. Photographs and personal information were posted to the internet. Geographic exclusion zones were added that severely restricted where registrants could live, work, or "loiter." In 2011, SORA was extensively amended to conform to the federal Sex Offender Registration and Notification Act (SORNA), 42 U.S.C. §16901. Those amendments retroactively classified registrants into three tiers, with tier classification determining the frequency of reporting and the length of time a person must register. Additional in-person and "immediate" reporting requirements were also imposed. JSOF ¶¶9-26, Doc. 90, Pg.ID# 3731-35.

Plaintiffs were all classified as Tier III registrants and retroactively subjected to registration for life. Before 2011, almost three-quarters of those on the registry

were twenty-five-year registrants. After 2011, almost three-quarters were lifetime registrants. *Id.* ¶¶21, 285-93, Pg.ID# 3734, 3784-86.

Michigan has an offense-based, rather than a risk-based, registry. Everyone convicted of a "listed offense" must register. M.C.L. §§28.722-23. Plaintiffs cannot get off the registry, or have their tier level reduced, even if they prove they present no danger to anyone. JSOF ¶¶27-29, Doc. 90, Pg.ID# 3735-36.

Michigan's registry, which is the fourth largest in the country, has had between 40,000 and 49,000 registrants in recent years. Approximately 2,000 registrants are added yearly. *Id.* ¶¶213-15, Pg.ID# 3769.

## II. The Plaintiffs

### A. John Doe #1

In 1990, when Doe #1 was twenty, he attempted to rob a McDonald's, his former employer. His charges included kidnapping because he struck and threatened the manager's fourteen-year-old son who was in the restaurant. Doe #1 never engaged in any sexual conduct during the attempted robbery. He has not been convicted of any crime since, nor has he ever been accused of sexual misconduct. *Id.* ¶¶35-50, Pg.ID# 3737-39.

Twenty-five years ago when Doe #1 was convicted, Michigan did not have a sex offender registry. Today, however, his kidnapping conviction requires registration. M.C.L. §28.722(w)(ii). In 2011, Doe #1 was retroactively classified as a

Tier III registrant, subject to supervision for life. JSOF ¶¶51-55, Doc. 90, Pg.ID# 3739-40.

Because of the exclusion zones, Doe #1 could not live with his family when he was released from prison. He was repeatedly denied jobs, including garbage collection, because he is a registrant. He tried to set up a home renovation business but was forced to close it because many contracting jobs are in exclusion zones. *Id.* ¶¶912, 938-40, Pg.ID# 3944, 3949-50.

Doe #1 now works as a vocational services coach for disabled adults. He has two adult children and a toddler, and co-parents his fiancé's daughter. *Id.* ¶¶48-49, 941, Pg.ID# 3739, 3950.

**B. John Doe #2**

In 1996, when Doe #2 was eighteen, he had a sexual and romantic relationship with a fourteen-year-old girl. He pled guilty under the Holmes Youthful Trainee Act (HYTA), M.C.L. §762.11, a record-sealing statute for youthful offenders, to criminal sexual conduct III, which prohibits sex with a person under the age of sixteen. Doe #2's plea was based on the prosecutor's promise that his case would be dismissed and his records sealed. JSOF ¶¶60-71, Doc. 90, Pg.ID# 3741-43.

Doe #2 served in the active-duty military twice, suffered a traumatic brain injury in a grenade explosion, and receives disability benefits. He earned two

honorable discharges. He has a teenage daughter. *Id.* ¶¶79-81, 93, Pg.ID# 3744-45, 3747.

For nearly fifteen years Doe #2 lived without the burdens of sex offender registration. Around 2010, Doe #2 learned that he had retroactively become subject to SORA. In 2011, he was classified as a Tier III registrant, subject to supervision for life. Doe #2 was four years and one month older than his underage partner. Had the age difference been less than four years, he would not be subject to registration under SORA's "Romeo and Juliet" exceptions. *Id.* ¶¶76, 82-86, Pg.ID# 3744-46; M.C.L. §§28.722(w)(iv); 28.728(c)(14).

Doe #2's HYTA adjudication is not a conviction and does not appear on a background check. He has no other criminal history. But for the fact that he is listed on the registry, employers, landlords, and the public would be unaware of his sealed, youthful offense. JSOF ¶¶87-89, Doc. 90, Pg.ID# 3746. Even though Doe #2 has no criminal history, landlords, employers, and educational programs reject him because of the registry. As a disabled military veteran, Doe #2 would qualify for subsidized housing but is barred because he is a lifetime registrant. *Id.* ¶¶914-17, 942-43, 981-82, Pg.ID# 3944-45, 3950, 3960-61.

### C. John Doe #3

In 1998, when John Doe #3 was nineteen years old, he had a romantic and sexual relationship with a fourteen-year-old girl, whom he believed was older. He

pled guilty under HYTA, pursuant to which his record was to be sealed. During his last year of probation, Doe #3 was one day late in completing his quarterly registration because he was on vacation and the police station was closed when he returned. As a result, his HYTA status was revoked and a conviction entered. *Id.* ¶¶98-99, 111-115, Pg.ID# 3748-51.

At the time of Doe #3's conviction, Michigan did not have a public, internet-based registry. In 2011, he was retroactively classified as a Tier III offender, and his registration period was extended from twenty-five years to life. Had the age difference between Doe #3 and his underage partner been less than four years, he would not be subject to registration under SORA's "Romeo and Juliet" exceptions. *Id.* ¶¶112-13, 120-21, Pg.ID# 3750, 3752; M.C.L. §§28.722(w)(iv); 28.728(c)(14).

Doe #3 works at his family's auto repair business. He and his wife, a schoolteacher, have three young sons. JSOF ¶¶117-19, Doc. 90, Pg.ID# 3751-52.

### D. John Doe #4

In 2005, when Doe #4 was twenty-three, he had a sexual and romantic relationship with I.G., whom he met at an eighteen-and-over nightclub. He and I.G. married in June 2015. *Id.* ¶¶123-25, Pg.ID# 3752; Doe #4 Second Declaration, Doc. 116, Pg.ID# 6012.

When they first met, Doe #4 did not know that I.G. was 15. He assumed she was of-age because they met at an eighteen-and-over nightclub. After I.G. became

pregnant, Doe #4 was prosecuted. He first learned that I.G. was underage when he was questioned by police. He pled guilty to criminal sexual conduct III. JSOF ¶¶126-31, Doc. 90, Pg.ID# 3753.

Doe #4 has been fired repeatedly when employers learned he was on the registry, once due to an anonymous call and once when his sex offender registry photograph appeared in a newspaper that republishes such information. After losing his job, he lost his home to foreclosure and became homeless. When he was offered a different job, he could not accept because the new job was in an exclusion zone. *Id.* ¶¶919, 945-50, Pg.ID# 3945, 3951-52.

Doe #4 and his wife, I.G., are raising two children together, the daughter whose conception resulted in the criminal case, and a new baby. Even though I.G. works as a leasing agent, she could not find a home where the family could live together because many properties are in exclusion zones and others would not accept registrants. Doe #4 has been homeless, while I.G. and the children lived with her parents. Their house is near a school, and Doe #4 could not risk living there because he could not tell if it was inside the exclusion zone. Doe #4 also could not live with his mother or sister, both of whom were threatened with eviction when he stayed with them. *Id.* ¶¶134, 562-70, 921-26, Pg.ID# 3754, 3862-66, 3945-47.

Doe #4 received an anonymous death threat by mail – a print-out of his sex offender registry page with his eyes blacked out on the photo, and the handwritten message "You will die." *Id.* ¶997, Pg.ID# 3964-65.

Doe #4 was initially required to register for twenty-five years. In 2011, he was retroactively classified as a Tier III registrant, subject to supervision for life. *Id.* ¶¶132-33, Pg.ID# 3753-54.

### E. John Doe #5

In 1979, when Doe #5 was twenty-one years old, he had sex with a seventeen-year-old woman. He said the sex was consensual, but she said it was not. He took the case to trial and lost. At that time Michigan did not have a sex offender registry. *Id.* ¶¶145-54, Pg.ID# 3756-57.

For over thirty years, Doe #5 was not required to register or comply with SORA. He could live where he wanted and was not required to report to the police. He was never charged with or convicted of a new sex offense. In 2011, after being convicted of illegally removing sheet metal from an abandoned building, Doe #5 was retroactively required to register for life as a Tier III offender pursuant to SORA's "recapture" provisions. M.C.L. §28.723(1)(e). He initially did not register, believing he should not be required to register for something that occurred in 1979. As a result, he was jailed for ninety days. JSOF ¶¶157-70, Doc. 90, Pg.ID# 3758-60.

After Doe #5 was added to the registry, he became subject to the exclusion zones and was forced to move out of his apartment, which was within 1,000 feet of a school. *Id.* ¶172, Pg.ID# 3761.

Doe #5 has a girlfriend, children, and grandchildren. *Id.* ¶174, Pg.ID# 3761.

**F. Mary Doe**

In 2003, while living in Ohio, Mary Doe had a sexual affair with a fifteen-year-old boy and was convicted of unlawful sexual conduct with a minor. At that time, Ohio's registration statute was risk-based rather than offense-based. As a result of a psychological evaluation, Ms. Doe was assigned the lowest risk level, which made her subject to annual address verification for ten years. Although Ohio has since moved to an offense-based registration scheme, the Ohio Supreme Court held that people like Ms. Doe, who received individualized risk-based assessments, cannot be retroactively reclassified under an offense-based scheme. In Ohio, Ms. Doe could not be required to register for more than ten years, nor be subjected to restrictions beyond those imposed in her initial registration order. *Id.* ¶¶177-90, Pg.ID# 3761-64.

In 2004, Ms. Doe moved to Michigan because her elderly parents, step-children, and grandchildren all live there. She was subject to twenty-five-year registration. In 2011, she was retroactively re-classified as a Tier III offender,

subject to lifetime registration. She lives with her daughter and husband. *Id.* ¶¶193-99, Pg.ID# 3765-66.

### G. Risk Assessments Show That the Plaintiffs Are Unlikely to Reoffend.

Plaintiffs submitted unrefuted expert reports showing that, contrary to popular misperception, most people convicted of sex offenses do not recidivate. Fay-Dumaine and Levenson Expert Reports, Docs. 90-24, 90-25, Pg.ID# 4641-96; JSOF ¶¶301-371, Doc. 90, Pg.ID# 3787-3808. Sex offenders determined to be low risk through validated actuarial instruments are actually *less likely* to commit a new sex offense than a baseline comparison group of non-sex offenders are to commit an "out-of-the-blue" sex offense. Even for high-risk sex offenders, the likelihood of re-offending drops below the baseline risk of non-sex offenders over time. The risk for sexual offending is around three percent in the general male population. JSOF ¶¶305-11; 319; 347-57, Doc. 90, Pg.ID# 3789-90, 3792-93; 3800-04.

Dr. Fay-Dumaine conducted an actuarial risk assessment of Does #2-4, finding they currently have a five percent risk of recidivating, which, when they reach the age of thirty-five, will decrease to between three and four percent, and decrease further over time. Doe #1 could not be scored because he did not commit a sex offense. Doe #5 was not scored, as he intervened late in the litigation, and Mary Doe was not scored because the risk assessment tool used has not been validated for women. Ms. Doe was found to be low risk based on a clinical

assessment in Ohio. JSOF ¶¶188, 332-39, Doc. 90, Pg.ID# 3763-64, 3796-98; Fay-Dumaine Report, Doc. 90-25, Pg. ID# 4682-88.

## III. Evidence on Geographic Exclusion Zones

Plaintiffs are prohibited from residing, working, or "loitering" within a "student safety zone," defined as "the area that lies 1000 feet or less from school property." M.C.L. §§28.733(f), 28.734, 28.735. "School property" means:

> a building, facility, structure, or real property owned, leased, or otherwise controlled by a school, other than a building, facility, structure, or real property that is no longer in use on a permanent or continuous basis, to which either of the following applies:
>
> (i) It is used to impart educational instruction.
> (ii) It is for use by students not more than 19 years of age for sports or other recreational activities.

M.C.L. §28.733(e). "School" means "a public, private, denominational, or parochial school offering developmental kindergarten, kindergarten, or any grade from 1 through 12. School does not include a home school." M.C.L. §28.733(d).

A first-time violation is a misdemeanor punishable by a year's imprisonment, and subsequent violations are felonies punishable by two years' imprisonment. M.C.L. §§28.734(2); 28.735(2).

### A. Exclusion Zones Severely Limit Registrants But Do Not Decrease Recidivism.

Exclusion zones cover vast areas, severely restricting access to employment and housing, increasing transience and homelessness, and limiting registrants'

ability to engage in normal human activity. JSOF ¶¶380-88, 911, Doc. 90, Pg.ID# 3810-14, 3943. For example, expert Peter Wagner produced a map showing that in Grand Rapids, Michigan, 46% of property parcels are off limits:




Figure 10.

JSOF ¶83, Doc. 90, Pg.ID# 3811, Wagner 2nd Report, Doc. 91-2, Pg.ID# 4756.

A 2013 Department of Justice study found that geographic restrictions in Michigan did not decrease but rather may have *increased* recidivism. Exclusion zones force many registrants to relocate, prevent them from living with family, and make it difficult to find work. Experts Jill Levenson and J.J. Prescott similarly report that residency restrictions lead to housing instability and are likely to *increase* recidivism. JSOF ¶¶497-507, Doc. 90, Pg.ID# 3846-49; Levenson Report, Doc. 90-24; Pg.ID# 4643-54; Prescott Report, Doc. 90-23; Pg.ID# 4613-24.

**B. Exclusion Zone Boundaries Depend on Measurement Methods.**

Wagner's expert report shows how different measurement methods dramatically affect the size and shape of exclusion zones. A 1,000-foot zone measured from a school property line is much larger than a zone measured from a single point at the school. The differential was 3.5 times larger in this example:




*1,000-foot zones drawn around each of three nested protected areas: the school's entrance (school symbol), the school building (orange) and the school property (brown).*

JSOF ¶¶389-97, Doc. 90, Pg.ID# 3815-19.

Exclusion zones are not necessarily shaped like simple circles. Measuring 1,000 feet from a single point produces a circle, but measuring 1,000 feet from/to a parcel boundary produces an irregular shape. As the figures below show, using parcel property lines creates oddly shaped exclusion zones, since the entire parcel becomes off limits if any part is within 1,000 feet of school property. The size of intersecting parcels affects the zone's total size. *Id.* ¶398, Pg.ID# 3820.




*Geographic zone measured from*
*school entrance to home property line.*




*Geographic zone measured from*
*school building perimeter to home property line.*




*Geographic zone measured from*
*school property line to home property line.*

*Id.* ¶398, Pg.ID# 3820-21.

### C. Law Enforcement Does Not Know How to Measure Exclusion Zones.

The Michigan State Police (MSP) Registry Coordinator testified that Sex Offender Registration (SOR) staff "don't know if the registry is supposed to be from one parcel to a point or a parcel to a parcel or point to point." *Id.* ¶406, Pg.ID# 3824. The Enforcement Coordinator affirmed that "it would be the local law enforcement decision whether to measure from the building to the property line or whether to measure from the property line to property line" and that "there's so many law enforcement agencies in the state of Michigan you would have to individually contact every one to see what they are specifically doing." *Id.* ¶¶418-19, Pg.ID# 3827-28.

Plaintiffs' survey of law enforcement agencies showed these agencies were unable to answer, or provided varying answers to, questions about the zones, such as whether school sports fields are included or under what circumstances registrants may pass through zones. The SOR Enforcement Coordinator gave incorrect answers when asked whether the zones apply to universities or whether homeless people can access shelters within zones. *Id.* ¶¶701-07, Pg.ID# 3895-96.

MSP SOR staff "tried but [] could not find" a list of properties that qualify as "school properties," as defined by SORA. *Id.* ¶450, Pg.ID# 3835-36.

**D. Zone Boundaries Are Effectively Unknowable.**

Neither the boundaries of exclusion zones nor the property boundaries of schools or other parcels are marked by signs. Maps identifying exclusion zone boundaries are not available. Nor is there any available information explaining how to determine those boundaries. The SOR Enforcement Coordinator testified that he did not know how a registrant would know where school property lines are. *Id.* ¶¶440-43, 455-58, Pg.ID# 3833, 3836-37.

If exclusion zones are measured property line to property line, one must obtain parcel data to accurately map the zones, because as expert Wagner testified:

> [A]ssuming, and in Michigan this is a big assumption, assuming that... the statute is measured on a property line to property line basis, you have to know where property lines actually are.

*Id.* ¶¶444, Pg.ID# 3834.

The MSP SOR Unit has tried but failed to obtain parcel data needed for property-line to property-line measurement. *Id.* ¶¶431-33, Pg.ID# 3831. Expert Wagner tried repeatedly and unsuccessfully to obtain parcel data. Many jurisdictions did not have it and in others the cost of the data ran as high as six figures. After "several years and many pages [of correspondence]," Wagner was "eventually able to find parcel data for parts of just one county in Michigan." Despite having specialized software and mapping expertise, it took Wagner sixteen hours to map exclusion zones in one city. *Id.* ¶¶446, 462-68, Pg.ID# 3834-65, 3838-40. Wagner concluded:

> Exclusion zones in Michigan are not only unknowable for the average person on the street. They are also unknowable to trained geographers with special software, access to specialized data and expertise in criminal justice mapping.

*Id.* ¶469, Pg.ID# 3840.

Unlike police, who can work backwards from a given spot to decide if it is within an exclusion zone, registrants must comply with the zones in all their daily activities, whether going to a new work site or walking through a neighborhood with children in tow. *Id.* ¶¶470-71, Pg.ID# 3840-41.

## IV. Evidence on "Loitering"

"Loiter" is defined as "to remain for a period of time and under circumstances that a reasonable person would determine is for the primary purpose of observing or contacting minors." M.C.L. §28.733(b). A first-time loitering

offense is a misdemeanor punishable by a year's imprisonment, and subsequent violations are felonies punishable by two years' imprisonment. M.C.L. §28.734(2).

The statutory definition of "loitering" contains no exception for observing one's own children. Defendants-Appellants "neither admit nor deny that plaintiffs' contacting or observing their own children constitutes 'loitering'." JSOF ¶587, Doc. 90, Pg.ID# 3869. Some MSP SOR staff testified that observing one's own child within an exclusion zone is "loitering," while others did not know. A survey of local law enforcement revealed that different agencies gave different answers when asked whether registrants can pick up their children at school, attend parent-teacher conferences, go to their children's sporting events, or take their children to school playgrounds on the weekend. When asked whether a registrant could attend his/her child's football games, the MSP Coordinator testified: "[S]ome prosecutors might say that's fine and others might say it's a violation." *Id.* ¶¶591-97, Pg.ID# 3870-72.

Plaintiffs, as well as Doe #3's wife, S.F., and Doe #4's wife, I.G., explain how the uncertainty about what "loitering" means affects registrants' parenting, especially involvement in their children's education. *Id.* ¶¶516-86, Pg.ID# 3851-69. For example, S.F. testified that Doe #3 does not attend parent-teacher conferences because that is a "gray area" in the law. "[C]an he be arrested for that?

I don't know." *Id.* ¶551, Pg.ID# 3859. Doe #3 fears prosecution if he attends his sons' football games. S.F. testified about the impact on their family:

> [M]y oldest son…plays football, he starts in all the games, and he sees dads there and he always asks me [why his dad is not there], and he gets emotional and he cries and he thinks his dad doesn't care. Then I have to see my husband crying…. I know nothing about football, but I'm learning because I have to live with this for the rest of my life.

*Id.* ¶¶554-55, Pg.ID# 3860-61. Similarly, Mary Doe testified that because of the "loitering" prohibition, she could not attend her daughter's eighth grade graduation or school plays, and that, despite repeated inquiries to law enforcement, "there has never been a clear answer" on whether she can drop off and pick up her child at school. *Id.* ¶¶576-86, Pg.ID# 3866-69.

Expert Richard Stapleton, the former Michigan Department of Corrections (MDOC) Legal Affairs Administrator, described situations where parole agents approved registrants to be in particular areas, but other law enforcement agencies said the registrants were illegally "loitering." *Id.* ¶849, Pg.ID# 3928.

## V. Evidence on Reporting Requirements

SORA's reporting requirements, which are too extensive to be detailed here, are set out in the Summary of Obligations, Disabilities, and Restraints, Doc. 91-10, Pg.ID# 4822-4836. Willful violation of SORA's reporting requirements is a felony

punishable by up to ten years' imprisonment. Non-willful violation is a misdemeanor punishable by up to two years' imprisonment. M.C.L. §28.729.

Registrants must report "immediately" (within three days) when they engage in a wide range of activities, such as setting up a new email account, establishing any other "designations used in internet communications or postings," beginning or discontinuing to "regularly operate any vehicle," moving, beginning/discontinuing employment, traveling away from home for more than seven days, enrolling/ending enrollment as a student, or changing their appearance. Summary of Obligations §13, Doc. 91-10, Pg.ID# 4832-33; M.C.L. §§28.724a; 28.725(1); 28.725a(8).

Registrants must also report in person every three months on an even wider range of information, including all nicknames, telephone numbers "routinely used," any place of temporary lodging used for more than seven days, the license plate and registration of any vehicle "regularly operated" and its storage location, and the name and address of any person who has agreed to hire/contract with the registrant for services. Summary of Obligations, §§2, 12, Doc. 91-10, Pg.ID# 4824-26, 4831-32; M.C.L. §§28.725a; 28.727.

Plaintiffs stated that SORA's reporting requirements are more onerous than those they experienced on probation/parole, an observation confirmed by former MDOC Legal Affairs Administrator Stapleton. Registrants must report in person

within three days when certain information changes, must report more information than parolees/probationers, and must do so for life rather than for a set term of parole/probation. While parole/probation conditions are frequently relaxed over time and can be administratively challenged, SORA's requirements have increased over time and cannot be contested. JSOF ¶¶976-80, Doc. 90, Pg.ID# 3958-60.

A survey of law enforcement agencies and prosecutors' offices found that those surveyed often could not answer, or provided conflicting answers to, questions like when registrants must report an address change or whether registrants must report self-employment, online education, or travel. When asked how often a registrant could use a vehicle before having to report it, some respondents did not know, and others provided answers ranging from once or twice, to six or seven times, to "whatever is reasonable." *Id.* ¶¶700-03, 854-860, Pg.ID# 3894-95, 3930-33; Poxson and Granzotto Declarations, Docs. 91-8, 91-9; Pg.ID# 4799-4821.

MSP SOR staff similarly did not know how often registrants can "regularly use" an item before being required to report. The SOR Enforcement Coordinator testified that "each law enforcement agency might come to a different conclusion about what regular use means." JSOF ¶ 859, Doc. 90, Pg.ID# 3933. The SOR State Coordinator testified:

Q: [I]f you don't know the answer to those questions, is there any information that is given to registrants that would allow them to know the answer to those questions?

A: Not that I know of.

*Id.* ¶¶ 857, Pg.ID# 3932. SOR staff also could not answer questions about whether registrants must report volunteering at a church fundraiser, snow-shoveling for pay, or being assigned to a different job site for a week. *Id.* ¶856, Pg.ID# 3931-32.

Plaintiffs do not understand what they have to report. *Id.* ¶¶861-883, Pg.ID# 3933-37. For example, Doe #1, who drives vehicles from his employer's fleet, testified that he did not know whether "to register 36 vehicles [in the fleet] because there may come a time I may get van 27." *Id.* ¶861, Pg.ID# 3933.

Plaintiffs testified that they did not use the internet or limited their use because they were unsure what to report and could not get clear answers from law enforcement. *Id.* ¶¶640-93, Pg.ID# 3883-93. While ninety-two percent of adult Americans use email, less than half of all non-incarcerated Michigan registrants report having an email address or other internet identifier. Theoretically internet information could be used to identify a person contacting a minor online. However, In the years since internet reporting has been required, no police department has ever asked the MSP to do so. *Id.* ¶¶614-15, 638-39, Pg.ID# 3876-77, 3882.

## VI. Evidence Relevant to Strict Liability and Vagueness

It is impossible to set out here all the terms Plaintiffs find confusing. They are listed in Plaintiffs' Response to Defendants' Interrogatory 11, Doc. 91-11, Pg.ID# 4839-44.

Plaintiffs testified that they do not understand their SORA obligations, cannot get answers, or get incorrect answers, from law enforcement, and severely limit their activities out of fear of inadvertently violating SORA. They cannot decipher the statute, and have difficulty keeping up with SORA's amendments, which have frequently changed and added to their obligations. Doe #3 stated:

> It seems like the state is more concerned with getting us on the list than telling us what the rules are. There is not [sic] manual or rulebook that we can look at to figure out what we can and cannot do. There aren't any public maps about where the student safety zones are either. It seems like if they want us to follow the rules, they should tell us what the rules are.

His wife stated that, as a result of this uncertainty, "we avoid anything that could potentially get him in trouble or arrested." Doe #4 explained, "[T]he consequence[] of making a mistake" about what SORA requires is "[p]rison, and I don't want to go to prison." JSOF ¶¶810-47, Doc. 90, Pg.ID# 3919-27.

When asked how registrants could determine whether activities like attending a child's football game, volunteering at a church picnic, or taking a job would violate SORA, the SOR Unit Manager testified that because different law enforcement agencies interpret SORA differently, registrants should contact their

local agency before engaging in such activities. This would, for example, require a registrant who applies for fifty jobs to contact multiple police departments to determine for each of the fifty jobs if the local police believe the job site is in an exclusion zone. Doe #3's wife explained that "anything we want to do we have to think of [the registry] first" to see whether that activity is permitted. *Id.* ¶¶798-800, Pg.ID# 3915-17.

MSP SOR staff testified that they refer questions about SORA to local law enforcement or local prosecutors, in part because "prosecutors make different decisions from county to county." During Plaintiffs' survey of law enforcement agencies, however, only twenty of fifty-two police agencies and only five of twenty-nine prosecutors' offices answered the surveyor's questions. Many local agencies did not know the answers, did not respond to repeat calls, or told the surveyors to contact the MSP for answers. *Id.* ¶¶787-802, Pg.ID# 3913-17.

Former MDOC Legal Affairs Administrator Stapleton testified that although he is an attorney and was professionally responsible for providing guidance to the MDOC on SORA, "[t]here's so many requirements within SORA it's hard to remember them all." He received many questions about SORA, but found that many "could not be appropriately answered because of the lack of adequate definition or guidance within SORA itself." He testified that there is "very much inconsistency" and a "great deal of disparity" in how SORA is applied across the

state. Although the MDOC has "sex offender specific" caseloads and agents who specialize in SORA's technical requirements, "even with intensive supervision, SORA's complexity and vagueness all but guarantee that parolees and probationers will still be unsure about what they can and cannot do." Registrants who are not under MDOC supervision do not have access to parole/probation officers to answer questions. *Id.* ¶¶709-24, Pg.ID# 3896-3901.

The only document provided to registrants that describes what information they must report is the "Explanation of Duties" Form, which is providing during initial registration. The MSP SOR manager testified that "[t]he statute has things in it that are not in this explanation of duties." *Id.* ¶¶765-75, Pg.ID# 3909-10. After the 2011 statutory changes, the SOR Unit sent a mass mailing notifying registrants of their tier level. The SOR Unit manager testified that the letters "weren't intended to be comprehensive about what the requirements were." *Id.* ¶¶783-86, Pg.ID# 3912-13.

SORA provides that law enforcement agencies "[s]eek a warrant for the individual's arrest if the legal requirements for obtaining a warrant are satisfied." M.C.L. §28.728a(1)(d). MSP training materials state: "[E]very non-compliant offender shall have a warrant." JSOF ¶899, Doc. 90, Pg.ID# 3941. The MSP does not provide guidance to local police on how to handle situations where registrants cannot comply due to age, disability, or other factors. *Id.* ¶890, Pg.ID# 3938-39.

Even when registrants do get advice from law enforcement about their obligations, reliance on that advice does not protect them from prosecution. For example, Stapleton testified about cases where parole agents approved registrants' activities, only to see prosecutors charge those registrants with SORA violations. *Id.* ¶¶847-49, Pg.ID# 3927-28; *id.* ¶848 (prosecution even though registrant was "doing exactly what [he] had been told to do by local law enforcement").

Between 1996 and 2013, over 10,000 felony and almost 7,000 misdemeanor charges were brought against Michigan registrants. SORA Charging Data, Doc. 91-21, Pg.ID# 4903-05. Since 2000, almost 8,000 people have been convicted of violating M.C.L. §28.729(2) (strict liability for reporting violations). Another 450 were convicted of violating M.C.L. §§28.734(2), 735(2) (strict liability for exclusion zones) between 2006, when the exclusion zones were enacted, and 2013. SORA Conviction Data, Doc. 91-22, Pg.ID# 4906-08.

Eighty-three different county prosecutors' offices prosecute SORA violations. Approximately 600 law enforcement agencies can access the SORA database. JSOF ¶¶696-98, Doc. 90, Pg.ID# 3894.

## VII. Procedural History

Plaintiffs-Appellees concur in Defendants-Appellants' description of the proceedings below.

## SUMMARY OF ARGUMENT

Defendants appeal the district court's holdings with regard to four parts of SORA: (1) the geographic exclusion zones; (2) "loitering"; (3) reporting provisions triggered by "regular" or "routine" use; and (4) strict liability. The court enjoined Defendants from enforcing these provisions against Plaintiffs, and ordered that SORA be construed consistently with the court's opinion.

The central question linking these four issues is whether registrants can be held criminally responsible when they do not know whether their conduct is illegal. Can the state constitutionally punish even inadvertent non-compliance with a statute that pervasively regulates almost every aspect of registrants' lives, but does not provide clear notice to either registrants or law enforcement of what actions or inactions are required or forbidden? The district court said no, holding that each of these four aspects of SORA is unconstitutional for essentially the same reason: the Constitution demands, but SORA fails to ensure, that people have fair notice of what conduct is a crime.

The district court should be affirmed because the Constitution limits criminalizing behavior that people cannot know is illegal or that is not inherently wrongful. Neither registrants nor law enforcement know what conduct is prohibited/required. Therefore, SORA's exclusion zones, "loitering" prohibition, and certain reporting requirements are unconstitutionally vague both on their face

and as applied. Finally, because SORA criminalizes a wide range of innocuous behavior and imposes serious penalties, holding registrants strictly liable for violations is unconstitutional.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 52, the district court's findings of fact "must not be set aside unless clearly erroneous." Fed.R.Civ.P. 52(a)(6). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous…even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Anderson v. City of Bessemer City,* 470 U.S. 564, 574 (1985). Legal conclusions are reviewed *de novo*. *Pressman v. Franklin Nat'l Bank,* 384 F.3d 182, 185 (6th Cir. 2004).

## ARGUMENT

### I. The Constitution Requires People to Know, or Have Reason to Know, That Their Conduct is Illegal Before Criminal Liability May be Imposed.

#### A. The Constitution Requires Fair Notice Before Imposing Criminal Responsibility.

"Engrained in our concept of due process is the requirement of notice." *Lambert v. California*, 355 U.S. 225, 228 (1957). "Historically, our substantive criminal law…postulates a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong." *Morissette v. United States*, 342 U.S. 246, 250 n.4 (1952) (citation omitted). Because a person must be "free to

steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockord*, 408 U.S. 104, 108 (1972). "[S]o far as possible the line [between criminal and non-criminal conduct] should be clear." *McBoyle v. United States*, 283 U.S. 25, 27 (1931).

Notice is central to the void-for-vagueness doctrine. That doctrine reflects the principle that crimes must be sufficiently defined for both ordinary people and law enforcement to "understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The constitutional limits on strict liability likewise stem from our constitutional commitment to ensuring notice before imposing criminal responsibility: "the [notice] principle is equally appropriate where a person, wholly passive and unaware of any wrongdoing, is brought to the bar of justice for condemnation in a criminal case." *Lambert*, 355 U.S. at 228.

**B. SORA Must Meet a Heightened Standard for Clarity and Notice.**

The Supreme Court has explained that "[t]he degree of vagueness that the Constitution tolerates – as well as the relative importance of fair notice and fair enforcement" depends on several factors: the severity of the sanction, the mental culpability required, and whether the prohibition affects constitutional rights. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).

First, the Constitution has "greater tolerance of enactments with civil rather

than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498-99. "When criminal penalties are at stake…a relatively strict test is warranted." *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 252 (6th Cir. 1994). M.C.L. §§28.729, 28.734(2), 28.735(2).

Second, "[t]he constitutionality of a vague statutory standard is closely related to whether the standard incorporates a requirement of *mens rea*." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979). A "scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Hoffman Estates*, 455 U.S. at 499. But "in the absence of a scienter requirement…a statute is little more than a trap for those who act in good faith." *Peoples Rights Org. v. City of Columbus*, 152 F.3d 522, 534 (6th Cir. 1998) (citations omitted). The SORA provisions enjoined by the district court are all strict liability offenses. M.C.L. §§28.725a, 28.729(2), 28.734-735.

Third, "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Hoffman Estates*, 455 U.S. at 499. "An enactment imposing criminal sanctions or reaching a substantial amount of constitutionally protected conduct may withstand facial constitutional scrutiny only if it incorporates a high level of definiteness." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999). SORA affects Plaintiffs'

constitutional rights, including free speech, parenting, travel, and occupation. JSOF §§XII, XIV, XIX, Doc. 90, Pg.ID# 3854-94, 3943-67.

Finally, a statute which is unclear in multiple respects is reviewed more stringently than one with a single defect: "Each of the uncertainties in the [statute] may be tolerable in isolation, but their sum makes a task for us which at best could be only guesswork." *Johnson v. United States*, 135 S.Ct. 2551, 2560 (2015).

### C. Statutes That Do Not Provide Clear Guidance to the Public or Law Enforcement Are Void for Vagueness.

Three of the State's four claims on appeal concern vagueness. A statute is unconstitutionally vague if it (1) does not provide a person of ordinary intelligence notice of what conduct is prohibited, and (2) does not provide clear guidance for those who enforce its prohibitions. *Kolender*, 461 U.S. at 357. These requirements reflect the two primary goals of the void for vagueness doctrine: first, "to ensure fair notice to the citizenry," and second, "to provide standards of enforcement by the police, judges, and juries." *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1104 (6th Cir. 1995).

With respect to the first goal – notice to the citizenry – "a statute which either forbids or requires the doing of an act in terms so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926).

> The dividing line between what is lawful and unlawful cannot be left to conjecture…The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue. Penal statutes prohibiting the doing of certain things, and providing a punishment for their violation, should not admit of such a double meaning that the citizen may act upon the one conception of its requirements and the courts upon another.

*Id.* at 393. Among the most fundamental protections of due process is that "[n]o one may be required at peril of life, liberty, or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 287 (1961).

With respect to the second goal – clear law enforcement standards – the danger of unclear laws is that they give "law enforcement officers, courts and jurors unfettered freedom to act on nothing but their own preferences and beliefs." *United States v. Salisbury*, 983 F.2d 1369, 1378 (6th Cir. 1993). Thus, "the more important aspect of the vagueness doctrine is…the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358 (quotation omitted). In the absence of "explicit standards," those who enforce the law are vested with the power to make decisions on an *ad hoc* and subjective basis "with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108-09.

## II. The District Court Correctly Held that the Exclusion Zones Are Unconstitutionally Vague.

SORA criminalizes a wide range of otherwise innocent conduct (e.g., working, living, watching one's children) if registrants engage in that activity within the exclusion zones. M.C.L. §§28.734-28.735. Because such conduct is entirely legal outside the zones, both registrants and law enforcement must know where the zones are to know if the conduct is a crime.

Judge Cleland relied on the following facts to find that SORA's exclusion zone provisions fail to provide adequate notice of what conduct is criminal:

- Zones are not physically marked and registrants are not provided with maps demarking the zone boundaries.
- Michigan has not provided a list of school properties or parcel data to registrants or law enforcement.
- Registrants are unable to identify the zones because they lack the necessary software and data to map the zones.
- Tools such as Google Maps or phone books do not provide registrants with the necessary detail to accurately identify exclusion zones.
- Law enforcement itself does not have the means to calculate the exclusion zones, even if a uniform measurement method were adopted.
- "Because plaintiffs cannot know where the zones are, they must 'over-police' themselves, erring on the side of caution."

Opinion, Doc. 103, Pg.ID# 5887-90. Appellants have not shown these findings are clearly erroneous.

Judge Cleland held that the exclusion zones are unconstitutionally vague in

two ways: (1) "SORA does not provide sufficiently definite guidelines for registrants and law enforcement to determine from where to measure the 1,000 feet distance used to determine the exclusion zones"; and (2) "neither the registrants nor law enforcement have the necessary data to determine the zones even if there were a consensus about how they should be measured." *Id.* at Pg.ID# 5890. Both holdings are firmly grounded in the factual record and should be affirmed.

### A. SORA Does Not Provide Clear Notice to Registrants or Adequate Guidance to Law Enforcement About How to Measure Exclusion Zones.

The size, shape and boundaries of exclusion zones depend entirely on how the 1,000-foot distance is measured. Different methods result in zones of different sizes and dimensions. A straight property-line to property-line measurement will result in an irregularly shaped zone that is much larger than the circular zone created by a straight point-to-point measurement. JSOF ¶¶389-402, Doc. 90, Pg.ID# 3815-24; Wagner Reports, Docs. 91-1, 91-2, Pg.ID# 4703-4771.

SORA does not specify how the zones should be measured, but simply defines the exclusion zones as the "area that lies 1,000 feet or less from school property." M.C.L. §28.733(f). "School property" can be a "building, facility, [or] structure," but can also be "real property." M.C.L. §28.733(e).

MSP SOR Unit staff testified that they have no idea whether the zones should be measured point to point or property-line to property-line; it is up to local

law enforcement to decide how to measure, and every local agency could measure differently.[2] The State provides absolutely no guidance to law enforcement, much less to registrants, on how to measure the zones. JSOF ¶¶403-424, 455-61, Doc. 90, Pg.ID# 3824-29, 3836-38. Criminal liability thus depends entirely on the measurement methods adopted by different officers, departments, or prosecutors.

Laws that provide inadequate guidance on distance are unconstitutionally vague. In *Belle Maer Harbor*, 170 F.3d 553, this Court struck down an ordinance imposing a "reasonable radius" requirement for certain marine devices. The Court found this language unclear, holding "due process requires at least sufficient exactness to prevent arbitrary enforcement and give notice of what an individual must do to comply." *Id.* at 559. "[N]either the enforcement officer nor the [marine] operator can ascertain by examining the language of the ordinance alone whether criminal sanctions will result from [different distances] around a protected object." *Id.*

Likewise, in *Cunney v. Board of Trustees*, 660 F.3d 612, 620-21 (2d Cir.

---

[2] As Judge Cleland noted, the question may be even more complicated than determining whether to measure from the building or parcel boundary. Given that "school property" is defined as a "building, facility, structure or real property" used "to impart educational instruction" or "for sports and other recreational activities," it is unclear whether portions of school-owned property used for other purposes (e.g., school parking lots) should be excluded when identifying the starting point for measurement. M.C.L. § 28.733(e); Opinion, Doc. 103, Pg.ID# 5888-89.

2011), the court overturned a zoning ordinance that prohibited structures rising more than 4.5 feet above a river road. Although 4.5 feet is a measurable distance, the court found that it was "remarkably unclear" from what elevation the building height was to be measured. *Id.* The ordinance failed to give specific notice of how to design a compliant building and failed to provide objective standards for enforcement. *Id.* The village had multiple interpretations of how to measure height, allowing inconsistent, arbitrary enforcement. *Id.* at 622. SORA's 1,000-foot distance, like the 4.5 feet at issue in *Cunney*, may be numerically precise, but it is unconstitutionally vague because neither registrants nor police know from where to measure.

### B. Neither Registrants Nor Law Enforcement Have the Data and Tools Needed to Identify Exclusion Zones.

One cannot eliminate the constitutional problem by adopting the State's preferred statutory interpretation, namely property-line to property-line measurement.[3] Such a measurement method is premised on knowing where parcel boundaries are for both schools and nearby properties. But neither law enforcement nor registrants know those boundaries.

Parcel boundaries, like exclusion zones, are not marked with signs. Parcel data are simply not available. Indeed, although the State claims that most

[3] *See* Opinion, Doc. 103, Pg.ID# 5889 (discussing problems with State's interpretation).

prosecutors measure property-line to property-line, the MSP's own computer program measures point-to-point because even Michigan's Geographic Information Systems Office has been unable to secure parcel data necessary for property-line to property-line mapping. JSOF ¶¶426-54, Doc. 90, Pg.ID# 3830-36. Moreover, even if registrants could somehow access parcel data, few, if any, have the necessary technical skills and specialized software to accurately map the areas that are off limits.[4] *Id.* ¶¶462-69, Pg.ID# 3838-40.

The State, local police, and registrants all lack a list of "school properties" covered by SORA. While it is sometimes obvious that a particular building is "school property," in many cases it is not. Mr. Poxson testified that he "never was able to get an answer" about whether a school bus garage triggers an exclusion zone. *Id.* ¶803, Pg.ID# 3917. Similarly, a registrant playing catch with his son may not know whether the ball field he is using is owned by the city or the school district. And even MSP SOR staff, when asked about a particular Grand Rapids educational program, did not know whether it would qualify as "school property" or "how a registrant could figure out if it's a school." *Id.* ¶¶412, 449, Pg.ID# 3826,

---

[4] A statute can be vague even when precisely drafted if it is "written in a language foreign to persons of ordinary intelligence" and is so "technical or obscure that that it threatens to ensnare individuals engaged in apparently innocent conduct." *United States v. Caseer*, 399 F.3d 830, 836-37 (6th Cir. 2005). The complicated language of geographic mapping is a language which few registrants understand.

3835.

For registrants the task of identifying exclusion zones is made even more difficult because, unlike police who need only prove a zone violation at one specific moment in time, registrants must continuously know where zones are as they move about their daily lives. Every time registrants apply for a job, search for an apartment, or take their children to a playground, they must first determine if their activities will potentially take place in exclusion zones. As expert Wagner explained:

> Realistically the only way to [move about town without violating an exclusion zone] would be to map the entire city or county before you left the house and consult it constantly, or make your own smart phone app, but you really have to map everything in advance…For enforcement purposes the police can measure back from one point and it's very easy for them. For a person who's going about…daily life without having a map in advance it's impossible.

*Id.* ¶471, Pg.ID# 3841.

### C. Appellants' Counter-Arguments Are Unavailing.

Faced with overwhelming evidence that both registrants and law enforcement do not know, and cannot figure out, where the exclusion zones are, Appellants offer a string of internally inconsistent arguments why this Court should countenance such confusion.

First, Appellants argue that SORA should be read to require property-line to property-line measurement because one trainer for the Prosecuting Attorneys

Association of Michigan believes prosecutors generally charge on that basis. At the same time, Appellants argue that the inability of registrants or law enforcement to do property-line to property-line measurement is immaterial, since zones can be identified through point-to-point measurement, e.g., by finding school addresses in a telephone book or Google Maps and then measuring a 1,000-foot radius. Appellants' Br. 30-33. If police or registrants measure zones using Defendants' proposed tools, however, the zones will not reflect Defendants' proposed legal standard.

Next, Appellants argue that Plaintiffs cannot complain about lacking maps or lists of school properties because "law enforcement itself does not have a map or list of [school] property." *Id.* at 32. In essence, Appellants argue that SORA is clear because it fails both parts of the vagueness test: the public has no notice of what is prohibited and the police have no standards for enforcement. The State cannot claim the law is clear because *neither* the public nor law enforcement know what the law means.

Appellants also seek to turn the rule of lenity into a sword, seeming to concede that SORA is vague, but suggesting that the remedy is to ignore that

vagueness until someone is prosecuted.[5] The rule of lenity "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008). Appellants interpret the rule not as limiting ambiguity, but as allowing it. In their view, ambiguous laws are permissible because once a person is prosecuted, the ambiguity can be resolved in the defendant's favor. But "[t]he Constitution does not permit a legislature to set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999).

Appellants' argument that other states have SORA exclusion zones, Appellants' Br. 34, does not make Michigan's vague definition of Michigan's zones constitutional. *See Smith v. Goguen*, 415 U.S. 566, 582 n.31 (1974) (flag discretion statute unconstitutionally vague despite "the universal adoption" of similar statutes in all fifty states). While some courts have upheld exclusion zones, in none of those cases was there (1) a question about the starting point for measurement; (2) a factual record establishing that neither law enforcement nor

---

[5] Appellants simultaneously reject Judge Cleland's invocation of that very rule, which he found supported a limited reading of "school property," so that zones are measured not from parcel boundaries, but from specific property used for instruction, sports, or recreation. Appellants' Brief at 31-34; Opinion, Doc. 103, Pg.ID# 5889.

registrants have the means to identify the zones; or (3) a prohibition on working or "loitering," which requires even greater day-to-day knowledge of zone boundaries than a prohibition on residing.

In *Doe v. Miller*, 405 F.3d 700, 708 (8th Cir. 2005), the court, while rejecting a facial challenge[6] to Iowa's exclusion zones, explained "[t]here is no argument…that the words of the statute are unconstitutionally vague." Here, by contrast, the record clearly demonstrates and the trial court found that SORA fails to provide sufficient guidance to either registrants or police. In any event, the Eighth Circuit's tolerance for "varied enforcement," *Miller*, 405 F.3d at 708, directly conflicts with the Supreme Court's admonition that clear guidelines for law enforcement to prevent inconsistent enforcement are the most important aspect of the vagueness doctrine. *Kolender*, 461 U.S. at 358.

In *United States v. Nieves-Casano*, 480 F.3d 597, 603 (1st Cir. 2007), a possession-of-a-firearm-in-a-school-zone statute survived a vagueness challenge because it required the defendant to *know* she was in a prohibited area "and this scienter requirement ameliorates any vagueness concerns." SORA, by contrast,

[6] The *Miller* court explicitly noted the possibility of an "as applied" challenge by registrants who, despite the fact that many jurisdictions in Iowa provide maps, are unable to identify Iowa's zones. 405 F.3d at 706-08. *Miller* thus does not conflict with the district court's as-applied injunction in the case at bar. Opinion, Doc. 103, Pg.ID# 5945.

makes Plaintiffs strictly liable. The *Nieves-Casano* court also held that precise measurement was unnecessary to uphold the criminal conviction in that case because the defendant's offense was committed approximately 330 feet from a school, well inside the 1,000-foot zone. *Id.* at 604. Here, by contrast, Plaintiffs seek clarity in the form of prospective relief so they can go about their daily lives. Without knowing where the zones are, Plaintiffs face criminal prosecution – whether they are 330 feet or 999 feet from an undefined starting point – for engaging in utterly ordinary activities like taking their children to a playground, renting an apartment, or accepting a temporary assignment at a new job site.

*Klein v. San Diego County*, 463 F.3d 1029, 1039 (9th Cir. 2006), which concerned an ordinance prohibiting picketing less than 300 feet from a home, actually supports Plaintiffs' case. There the court explained "the language of the statute itself is not ambiguous" because (unlike here) the ordinance clearly required measuring from the dwelling, not the property line. *Id.* Moreover,

> the ordinance might nonetheless be unconstitutionally vague if it were impossible for the picketers to determine the 300-foot boundary with any precision and if the lack of a scienter element left picketers strictly liable for any violation. A law that requires a person to steer far wider of the unlawful boundary zone because of doubt about the boundary cannot stand.

*Id.* (citation omitted). Unlike *Klein*, where the district court made factual findings that picketers could estimate zones based on publicly-available maps, *id.*, the district court here found that maps, parcel data, and lists of school properties were

unavailable, and that neither Google Maps nor phone books "provide a registrant with the necessary detail" to measure zones. Opinion, Doc. 103, Pg.ID# 5889-90. Moreover, while it may be possible to estimate 300 feet, "1,000 feet is not a distance that the average person can accurately approximate visually," nor is it possible to measure 1,000 feet "with ordinary consumer tools." Wagner Expert Reports, Docs. 91-1, 91-2, Pg.ID# 4709-10, 4744-45.[7]

In sum, SORA's geographic exclusion zones are unconstitutionally vague because neither registrants nor law enforcement know where the zones are.

## III. The District Court Correctly Held that the "Loitering" Prohibition is Unconstitutionally Vague.

SORA defines "loiter" as "to remain for a period of time and under circumstances that a reasonable person would determine is for the primary purpose of observing or contacting minors." M.C.L. §28.733(b). Judge Cleland found the provision unconstitutionally vague: one cannot know "whether a registrant may attend a school movie night where he intends only to watch the screen, or a parent-teacher conference where students may be present." Opinion, Doc. 103, Pg.ID# 5893. The law's ambiguity has led Plaintiffs to extensively curtail their conduct,

---

[7] Appellants' state-court cases are even less on point. Neither *People v. Conti*, 27 Misc.3d 453, 454-55 (N.Y. City Ct. 2010), nor *Mann v. State*, 603 S.E.2d 283 (Ga. 2004), concerned a vagueness challenge to distance/measurement requirements, but instead discussed, respectively, whether an ordinance prohibiting registrants from entering a school was sufficiently specific, and whether Georgia's SORA statute adequately defined the term "child care facility."

even avoiding activities like waiting for their children at school or talking to a niece or nephew. *Id.* at 5891.

In *Morales*, a plurality found the definition of "loiter" in an anti-gang ordinance unconstitutionally vague. 527 U.S. 41. "[T]he term 'loiter' may have a common and accepted meaning, but the definition of that term in this ordinance…does not."[8] *Id.* at 56. The Chicago ordinance criminalized remaining in a place "with no apparent purpose," and the Court asked how a person could know if she has "an apparent purpose." *Id.* at 56-57. Similarly here, a registrant cannot know what a "reasonable person" would conclude is the registrant's "primary purpose." M.C.L. §28.733(b). Plaintiffs' surveys show that "loitering" means different things in different jurisdictions. Even MSP staff disagree about what activities are illegal. JSOF ¶¶591-97, Doc. 90, Pg.ID# 3870-72.

The district court's decision is also supported by *Elonis v. United States*, 135 S.Ct. 2001, 2011 (2015), where the Supreme Court emphasized that criminal liability cannot be defined under a "reasonable person" standard. The Court reversed a conviction (for making threats) which was premised on how the

---

[8] The Explanation of Duties Form simply says registrants may not "loiter," without any clarification or even recitation of the statutory definition. The Form does not explain that "loitering" under SORA is entirely different from "loitering" as commonly understood. Explanation of Duties, Doc. 92-12, Pg.ID# 5077.

defendant's web postings would be understood by a reasonable person: "Such a 'reasonable person' standard is a familiar feature of civil liability in tort law, but is inconsistent with the conventional requirement for criminal conduct – *awareness* of some wrongdoing." *Id.* (original emphasis). *See* Section V., *infra*.

A law that affects constitutionally protected conduct "may withstand facial constitutional scrutiny only if it incorporates a high level of definiteness." *Belle Maer Harbor*, 170 F.3d at 557. Appellants concede that they themselves do not know whether the statute prohibits registrant-parents from observing/contacting their *own* children within an exclusion zone (i.e., walking past a school with one's child in tow). JSOF ¶587, Doc. 90, Pg.ID# 3869. The district court was "unable to determine to what extent SORA infringes on Plaintiffs' right to participate in the upbringing and education of their children" because it is so unclear what the "loitering" ban prohibits. Opinion, Doc. 103, Pg.ID# 5918.

## IV. The District Court Correctly Held that Certain Reporting Provisions Are Unconstitutional.

The district court enjoined reporting and "immediate" reporting requirements triggered by:

- "regularly" operating a vehicle, M.C.L. §§28.725(1)(g), 28.727(1)(j) (as-applied injunction on vagueness grounds), or "routinely" using a telephone, M.C.L. §28.727(1)(h) (facial injunction on vagueness and First Amendment grounds); and

- "routinely" using or establishing electronic accounts or designations, M.C.L. §§28.727(1)(f), (i) (facial injunction on vagueness and First Amendment grounds).

Opinion, Doc. 103, Pg.ID# 5945-46. Appellants appear to concede the validity of the internet-related injunctions. This Court should treat them as abandoned.

Judge Cleland's thorough analysis – which finds that neither MSP SOR staff nor local police know what "regularly" and "routinely" mean, and which explains why the enjoined provisions are unconstitutional under this Court's standards in *Belle Maer Harbor*,[9] – need not be repeated here. Opinion, Doc. 103, Pg.ID# 5894-5900.

Appellants' efforts to refute that analysis are unconvincing. Appellants claim registrants know using a car every day is regular use, while using a car only once is not. Appellants' Br. 40. That may be true, but registrants cannot know where, between these two extremes, they have crossed the line between non-reportable and reportable conduct, between permitted acts and criminal offenses. How often

---

[9] In *Belle Maer Harbor*, 170 F.3d at 558, the government's position was "substantially undercut" by the enforcing officer's testimony that "[o]ne person's idea of a reasonable radius would vary from another's." *Id.* at 558. Here, too, the record shows, with respect to SORA enforcement, "every county's different." JSOF ¶795, Doc. 90, Pg.ID# 3915. *See also Forbes v. Napolitano*, 236 F.3d 1009, 1012 (9th Cir. 2000) ("dearth of notice and standards for enforcement arising from the ambiguity of the word[]…'routine'" rendered statute – which criminalized fetal tissue use except when necessary for "routine pathological examination" – unconstitutionally vague).

must Doe #1 drive each of the 36 vans in his employer's fleet before that van is reportable? JSOF ¶¶861, Doc. 90, Pg.ID# 3933.

Appellants cite *Déjà Vu of Nashville, Inc. v. Metro. Government of Nashville & Davidson County*, 466 F.3d 391 (6th Cir. 2006), but that was a First Amendment, not a vagueness, case, and the term "regularly depict" was never challenged. Appellants' reliance on *84 Video/Newsstand, Inc. v. Sartini*, No. 1:07-cv-3190, 2007 WL 3047207 (N.D. Ohio Oct. 18, 2007), is even more misleading. The statute there was not overbroad because it contained a definition of "regularly" that clarified the term. *84 Video/Newsstand, Inc. v. Sartini*, 455 Fed. App'x 541, 560-61 (6th Cir. 2011). Moreover, that statute had a *scienter* requirement, which "may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Sartini*, 2007 WL 3047207, at *8.

Finally, Appellants simply fail to apply First Amendment scrutiny to M.C.L. §28.727(1)(h), despite the relationship of telephone use to protected communication. Opinion, Doc. 21-1, Pg.ID# 5894.

## V. The District Court Correctly Held that SORA Cannot Make Registrants Strictly Liable for Innocent Conduct.

### A. Because Appellants Failed to Address Strict Liability Below, They Cannot Do So Now.

Appellants did not address strict liability in the court below. Opinion, Dkt.103, Pg.ID 5907. This Court's function is "to review the case presented to the district court, rather than a better case fashioned after a district court's unfavorable order." *Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 749 (6th Cir. 2005). An argument not made below is "forfeited on appeal." *Legg v. Chopra*, 286 F.3d 286, 294 (6th Cir. 2002). Issues "raised for the first time on appeal are not properly before the court." *J.C. Wyckoff & Associates, Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1488 (6th Cir. 1991).

### B. SORA's Strict Liability Provisions Violate Due Process Because They Impose Harsh Penalties for Innocent Conduct.

> The contention that an injury can amount to a crime only when inflicted by intention…is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory 'But I didn't mean to.'….It is alike the general rule of law, and the dictate of natural justice, that to constitute guilt there must be not only a wrongful act, but a criminal intention.

*Morissette*, 342 U.S. at 250-51, 274 (citations omitted). "While strict-liability offenses are not unknown to the criminal law and do not invariably offend constitutional requirements…, [t]he existence of a *mens rea* is the rule [], rather

than the exception." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 435, 437 (1978) (citations omitted). Without a scienter requirement, laws – particularly vague laws – may be "little more than a trap for those who act in good faith." *Colautti v. Franklin*, 439 U.S. 379, 395.

To determine whether strict liability violates due process, courts must consider: (1) does "the offense involve[] conduct for which one would not ordinarily be blamed," *Stanley v. Turner*, 6 F.3d 399, 404 (6th Cir. 1993), and (2) is the penalty "relatively small"? *United States v. Wulff*, 758 F.2d 1121, 1124 (6th Cir. 1985).

**1. SORA Criminalizes Innocent Activity.**

"[T]he term 'strict liability' is really a misnomer," because even when allowing strict liability for so-called "public welfare offenses," the Supreme Court has "require[d] at least that the defendant know that he is dealing with some dangerous or deleterious substance." *Staples v. United States*, 511 U.S. 600, 607 n.3 (1994). Thus while "strict liability" is sometimes permissible when regulating conduct that inherently presents a serious risk to public safety, the state cannot dispense with *mens rea* when criminalizing otherwise innocent behavior. *Compare, e.g.*, *United States v. Freed*, 401 U.S. 601, 609 (1971) (upholding strict liability for possession of unregistered grenades because "one would hardly be surprised to learn that possession of hand grenades is not an innocent act"), *with Liparota v.*

*United States*, 471 U.S. 419, 426, 431 (1985) (unauthorized possession of food stamps could not be strict-liability offense because a "food stamp can hardly be compared to a hand grenade" and dispensing with *mens rea* would "criminalize a broad range of apparently innocent conduct").

In *Lambert v. California*, 355 U.S. 225 (1957), the Court held that a law requiring felons to register violated due process. Strict liability was unconstitutional because the law "punished conduct which would not be blameworthy in the average member of the community." *Id*. at 229. Because the defendant received no notice, she could not and did not know the otherwise innocent act of being in Los Angeles was a crime, and she was given no opportunity to comply upon learning of the registration requirement. *Id.* at 227-29.

This Court has likewise held:

> [W]here a criminal statute prohibits and punishes seemingly innocent and innocuous conduct that does not in itself furnish grounds to allow the presumption that the defendant knew his actions must be wrongful, conviction without some other, extraneous proof of blameworthiness or culpable mental state is forbidden by the Due Process Clause.

*Stanley*, 6 F.3d at 404; *see also United States v. Apollo Energies, Inc.*, 611 F.3d 679, 687 (10th Cir. 2010) (strict liability "constitutionally suspect" when applied to conduct that is "commonly and ordinarily not criminal"). Here, registrants cannot be held strictly liable for entirely innocent conduct without notice that this conduct is a crime.

Just recently the Supreme Court reemphasized that *mens rea* is required for "*each* of the statutory elements that criminalize otherwise innocent conduct." *Elonis*, 135 S.Ct. at 2011 (citation omitted) (original emphasis). In *Elonis*, which concerned a conviction for communicating threats, the "crucial element separating legal innocence from wrongful conduct" was whether the communication was threatening. *Id.* Therefore the defendant could only be guilty if there was some proof that he knew he was making threats. *Id.* Likewise, registrants must know that they are acting illegally – e.g., that they are in an exclusion zone – to be criminally liable.

SORA's exclusion zones make registrants strictly liable for the most innocuous conduct – being employed, living with one's wife and children, attending a child's graduation or birthday party, or even talking to one's nephew on school grounds. JSOF ¶¶523, 554-555, 560, 563, 577, 849, Doc. 90, Pg.ID# 3952-53, 3860-61, 3861-63, 3867, 3928; M.C.L. §§28.734, 28.735. Similarly, under SORA's reporting requirements, registrants are strictly liable if they fail to report (often immediately and in person) on an enormous range of ordinary activities – borrowing a telephone, joining a fantasy football league, establishing an on-line account for a child's homework, or traveling for more than seven days. JSOF ¶¶825, 867, 877, 659, Doc. 90, Pg.ID# 3922, 3934, 3936, 3887; M.C.L. §§28.724a, 28.725, 28.725a, 28.727, 28.729(2); *see* Obligations, Disabilities, and

Restraints Imposed by SORA, Doc. 91-10, Pg.ID# 4822-36. Many of these ordinary activities are also constitutionally protected because they involve free speech, parenting, travel, and work. "Persons do not harbor settled expectations that [constitutionally protected activities] are generally subject to stringent public regulation." *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 71 (1994) (scienter required because of statute's impact on constitutionally-protected rights); *see also Smith v. California*, 361 U.S. 147 (1959) (strict liability unconstitutional where "timidity in the face of [] absolute criminal liability" keeps people from exercising constitutionally-protected rights).

Judge Cleland found that SORA-criminalized activities, like "taking one's children to a park…or failing to report a new e-mail account are…not inherently blameworthy," nor are they "so obviously against the public interest that a reasonable person should be expected to know" they are regulated. Opinion, Doc. 103, Pg.ID# 5907-08 (*citing Liparota*, 471 U.S. at 433). Not only does SORA criminalize entirely innocent activities, but – as discussed above – it does so through provisions that are extraordinarily vague. Registrants can easily make mistakes in trying to comply, even with requirements that at first glance seem clear, such as quarterly, in-person registration. For example, the MSP SOR manager testified that because recent SORA amendments changed the months

when registrants must report, "there are going to be [registrants who] are confused." JSOF ¶844, Doc. 90, Pg.ID# 3926.

Finally, as Judge Cleland explained, "SORA imposes myriad restrictions and…requirements that affect many aspects of registrants' lives." These requirements are so ambiguous and numerous that it is "difficult for a well-intentioned registrant" to comply. Moreover, SORA's frequent amendments "make a knowledge requirement even more important to ensure due process of law." Opinion, Doc. 103, Pg.ID# 5908. The comprehensiveness of SORA's strict liability regime, which touches almost every aspect of registrants' lives, is unparalleled, except perhaps in the business world where corporations employ a phalanx of lawyers to achieve compliance. *Cf. Goguen*, 415 U.S. at 574 ("in a noncommercial context behavior as a general rule is not mapped out in advance on the basis of statutory language"); *Hoffman Estates*, 455 U.S. at 498.

**2. SORA Imposes Significant Penalties.**

"[T]he penalty imposed under a statute has been a significant consideration" in determining whether strict liability is permissible. *Staples*, 511 U.S. at 616-17 ("'Crimes punishable with prison sentences...ordinarily require proof of guilty intent.'") (quoting Sayre, *Public Welfare Offenses*, 33 Colum.L.Rev. 55, 70 (1933)); *see also Morissette*, 342 U.S. at 256 (for strict liability offenses, "penalties commonly are relatively small").

In *Wulff*, this Court held that as a matter of constitutional due process a defendant could not be strictly liable for selling migratory bird parts because the penalty – two years' imprisonment or $2,000 – "is not, in this Court's mind, a relatively small penalty." 758 F.2d at 1125. SORA imposes that exact penalty. *See* M.C.L. §28.729(2) (two years or $2,000); §§ 28.734(2), 735(2) (second offense is felony, two years or $2,000).[10]

**C. Appellants' Counter-Arguments Are Unavailing.**

Appellants raise several arguments why SORA should fall within the "limited circumstances" where the Constitution allows an exception to the scienter rule.

First, Appellants complain that requiring willfulness makes it more difficult to convict, without explaining why it should be easy to punish people for innocent conduct. Appellants' Br. 19. Strict liability

> radically [] change[s] the weights and balances in the scales of justice. The purpose and obvious effect of doing away with the requirement of a guilty intent is to ease the prosecution's path to conviction, to strip the defendant of such benefit as he derived at common law from

---

[10] Appellants may try to distinguish *Wulff* as involving a felony. Exclusion zone violations can be felonies. M.C.L. §§28.734(2), 28.735(2). Moreover, the strict liability provision for reporting violations, M.C.L. § 28.729(2), is a "high court misdemeanor," an offense category under Michigan law that functions like a felony. *See People v. Delong*, 128 Mich. App. 1, 4 (1983) (offense labeled "misdemeanor" is treated like a felony because M.C.L. § 761.1(g) defines "felony" as offense punishable by more than one year of imprisonment).

> innocence of evil purpose, and to circumscribe the freedom heretofore allowed juries.

*Morissette*, 342 U.S. at 263. Slam-dunk convictions are not a civic good, but rather "a manifest impairment of the immunities of the individual." *Id.*

Second, Appellants suggest that courts have rejected strict liability only as a matter of statutory construction, not constitutional law, and that this Court cannot read scienter into SORA because one Michigan court has interpreted one of SORA's penalty provisions as imposing strict liability.[11] Appellants' Br. 20-22. However, *Lambert* squarely held that a felon-registration ordinance, which California courts had read as imposing strict liability, "violate[s] the Due Process requirement of the Fourteenth Amendment" because it criminalized "conduct that is wholly passive." 355 U.S. at 227-28. Similarly, in *Wulff*, this Court held that a strict liability provision of the Migratory Bird Treaty Act "den[ied] a defendant his right to due process." 758 F.2d at 1124. Because the Sixth Circuit had previously held that "Congress did not intend for scienter to be an element of the offense," the *Wulff* court decided the question on constitutional, not statutory, grounds. *Id.* Moreover, the fact that courts routinely invoke the doctrine of constitutional

---

[11] *People v. McFall*, __ N.W.2d __, 2015 WL 966039 (Mich. Ct. App. 2015), on which Appellants rely, is a statutory interpretation case, and does not address whether strict liability is constitutional. Moreover, *McFall* concerns only M.C.L. §28.729(2), and does not address whether the legislature intended M.C.L. §§28.734-35 (exclusion zones) to impose strict liability.

avoidance and interpret statutes as requiring *mens rea* only reinforces the constitutional rule. *See, e.g.*, *X-Citement Video*, 513 U.S. at 71 (1994); *Elonis*, 135 S.Ct. at 2009-10.; *Liparota*, 471 U.S. at 426.

Third, Appellants object to a "knowledge" requirement while at the same time claiming that registrants "know" their obligations because registrants get an "Explanation of Duties" Form and because one state witness said that SOR trainers recommend bringing registrants into compliance voluntarily before prosecuting them. Appellants' Br. 19.[12] But if all registrants know their duties and all law enforcement agencies seek voluntary compliance before bringing charges, then a *mens rea* requirement would never impede prosecution. A *mens rea* requirement does not prevent conviction when defendants know their obligations, but only when they do not.

That is precisely why strict liability is inappropriate. Not only has the state failed to notify registrants of all their obligations,[13] but the statute is so sweeping

---

[12] Appellants' discussion of the record is misleading. MSP SOR staff testified that registrants must comply with SORA regardless of whether they receive an Explanation of Duties Form, and SOR training materials state: "Every non-compliant offender shall have a warrant." JSOF ¶¶771, 899, Doc. 90, Pg.ID# 3909, 3941. Thousands of people have been convicted under SORA's strict liability provisions. SORA Conviction Data, Doc. 91-22, Pg.ID# 4906-08.

[13] As the state's own witnesses concede, the Explanation of Duties does not cover all of SORA's requirements, nor does the state provide any information on

and so vague that it is likely impossible for the state to craft a comprehensible notice that would cover the thousands of actions and inactions that trigger criminal liability under SORA. Moreover, the state concedes that it does not have the data necessary to accurately map the thousands of exclusion zones.

Finally, Appellants point to several state court decisions allowing strict liability for failure-to-register offenses. Appellants' Br. 21. In fact, state courts are split on whether SORA statutes can dispense with *mens rea*. *See, e.g.*, *State v. Giorgetti*, 868 So. 2d 512, 518-19 (Fla. 2004) ("public welfare offense rationale did not apply" to SORA because "harsh penalties apply [and] there is the potential to punish otherwise law-abiding, well-intentioned citizens for reasonable behavior," in contravention of *Lambert*); *People v. Lopez*, 140 P.3d 106, 110-13 (Colo. App. 2005) (given gravity of penalty, strict liability cannot be imposed for registration violations); *State v. Young*, 535 S.E.2d 380 (N.C. App. 2000) (incompetent defendant could not be strictly liable for registration violation because due process requires ability to comply); *State v. Garcia*, 752 P.2d 34, 36 (Ariz. Ct. App. Div. 1 1987) (under *Lambert* criminal intent is necessary for

---

exclusion zones. JSOF ¶¶455-69, 775-778, 781, Doc. 90, Pg.ID# 3836-40, 3910-11. *Compare* Explanation of Duties, Doc. 92-12, Pg.ID# 5075-77, *with* Summary of Obligations, Doc. 91-10, Pg.ID# 4822-36, *with* Grand Rapids Exclusion Zone Map, *supra*.

registration violation); *State v. Knowels* 643 N.W.2d 20 (N.D. 2002) (interpreting North Dakota registration statute as having *mens rea* requirement).

To the extent Appellants' cases suggest that the exception for so-called "public welfare offenses" applies because registrants are presumed dangerous,[14] that argument misunderstands the Supreme Court's strict liability jurisprudence. The "public welfare" exception is about inherently dangerous *conduct* (*e.g.*, handling hand grenades or firearms), not inherently dangerous *people*. *Liparota*, 471 U.S. at 433 (strict liability can only apply to offenses that involve "a type of *conduct* that a reasonable person should know is subject to stringent public regulation") (emphasis added). The fact that the defendant in *Lambert*, had a felony record did not somehow make her so dangerous that she could be prosecuted without clear notice that her otherwise innocent conduct was illegal. 355 U.S. 225.

Dispensing with *mens rea* for a class of people, rather than a type of conduct, eliminates the notice that is implicitly part of engaging in dangerous activities. It is that implicit notice that provides the analytical justification for finding that strict liability can comport with due process where inherently

---

[14] The record below refutes the assumption that all registrants are dangerous. JSOF ¶¶301-71, Doc. 90, Pg.ID# 3787-808. *See also* Ira Ellman, *The Supreme Court's Crucial Mistake About Sex Crimes Statistics*, Casetext (July 28, 2015) (Exhibit B).

dangerous conduct is involved. In Appellants' view, however, registrants are strictly liable for a limitless range of acts and omissions because of who registrants are, not because those acts and omissions (*e.g.*, working, creating an email account, traveling) involve inherently dangerous conduct. There is no implicit notice that such activities are crimes. The logical extension of person-based rather than conduct-based strict liability is that the legislature could dispense with *mens rea* for any group the legislature considers potentially dangerous or unsavory: the young, the poor, or the mentally ill.

In any event, Appellants' cases simply concern the duty to report after being informed of that obligation. The question here, however, is whether registrants are strictly liable for SORA's much wider range of criminal acts and omissions. The State has not taken any steps to inform registrants of the exclusion zone boundaries, registrants cannot get accurate information about their obligations, and even reliance on the advice of police or correctional officials cannot insulate them from criminal liability. JSOF ¶¶765-850, Doc. 90, Pg.ID# 3909-29.

States have considerable latitude in defining offenses, but "there are obviously constitutional limits beyond which the States may not go." *Patterson v. New York*, 432 U.S. 197, 210 (1977); *see Liparota*, 471 U.S. at 424 n.6 (legislature must "act within any applicable constitutional constraints in defining criminal offenses"). Those constitutional limits have been exceeded here.

## VI. SORA's Unconstitutionally Vague Provisions Are Facially Invalid.

The district court was correct in holding that the exclusion zones, the "loitering" prohibition, and the specified reporting requirements are unconstitutionally vague. Indeed, they are unconstitutional not simply as applied, they are unconstitutional on their face.[15]

The district court implicitly found the enjoined provisions unconstitutional with respect to all registrants, not just Plaintiffs. *See* Opinion, Doc. 103, Pg.ID# 5890 ("SORA does not provide sufficiently definite guidelines for *registrants*" to identify exclusion zones); Pg.ID# 5894 ("'loiter' is sufficiently vague as to prevent

---

[15] In affirming the district court's holding that these provisions are unconstitutionally vague, this Court should address whether they are facially invalid. In *Springfield Armory v. City of Columbus*, 29 F.3d 250 (6th Cir. 1994), when the district court had held that an ordinance banning assault weapons was unconstitutional as applied, on appeal this Court held that the proper analysis was to hold the ordinance unconstitutional on its face. Because "[n]othing in the ordinance provide[d] sufficient information to enable a person of average intelligence to determine" whether a possible gun purchase is illegal, the ordinance was facially invalid, not merely "vague as applied to a number of specific weapons." *Id.* at 254. Here, as with the gun purchases in *Springfield Armory*, SORA does not enable people of average intelligence to know the boundaries of exclusion zones, what constitutes "loitering," or which "regularly" or "routinely" used items they must report. Accordingly, a facial review – not merely "as applied" analysis – is required.

A separate question is whether, given that the provisions are facially unconstitutional, the district court should have enjoined the state from enforcing them under any circumstances, rather than merely as applied to Plaintiffs. Because Plaintiffs are not appellants here, this Court may choose to defer considering whether the actual injunction should have been broader until the Plaintiffs appeal after final judgment.

*ordinary people* using common sense" from knowing what conduct is covered); Pg.ID# 5900 (SORA "leaves *registrants of ordinary intelligence* unable to determine when the reporting requirements are triggered") (emphasis added).

As Judge Cleland recognized, courts have issued somewhat inconsistent statements regarding when unconstitutionally vague laws should be held invalid on their face rather than as applied. Opinion, Doc. 103, Pg.ID# 5885. *See also Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 252-53 (6th Cir. 1994) ("At times the [Supreme] Court has suggested that a statute that does not run the risk of chilling constitutional freedoms is void on its face only if it is impermissibly vague in all its applications, but at other times it has suggested that a criminal statute may be facially invalid even if it has some conceivable application.") (citations omitted).

However, the Supreme Court recently clarified that vague criminal laws should be facially invalidated. *Johnson v. United States*, 135 S.Ct. 2551, 2556 (2015). The Court struck down a sentencing enhancement provision triggered by conduct involving "serious potential risk of physical injury to another." The fact that some conduct clearly falls within the statute's ambit did not save the statute from facial invalidation. *Id.* at 2560-61. "[A]lthough statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some

conduct that clearly falls within the provision's grasp." *Id.* (original emphasis). The Court explained that making a facial challenge dependent on whether a statute is "vague in all its applications" is a "tautology: If we hold a statute to be vague, it is vague in all its applications[.]" *Id.* at 2561. Likewise here, because SORA is unconstitutionally vague, it is unconstitutionally vague for all registrants, not merely the named Plaintiffs in this case.[16]

Even without *Johnson*'s clarification, facial invalidation would be appropriate because SORA has three features that have long allowed for facial challenges: (1) it is a criminal law; (2) there is no *mens rea* requirement; and (3) it covers constitutionally protected conduct.[17] *See Morales*, 527 U.S. at 55 (facial attack permissible for criminal law containing no *mens rea* requirement that

---

[16] Some pre-*Johnson* cases reject facial challenges on the grounds that a "plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Hoffman Estates*, 455 U.S. at 494-95. But that line of cases would not apply here, even absent *Johnson*, because Plaintiffs have "establish[ed] that the statute is vague as applied to [their] particular case, not merely that the statute could be construed as vague in some hypothetical situation." *United States v. Krumrei*, 258 F.3d 535, 537 (6th Cir. 2002).

[17] *See* Opinion, Doc. 103, Pg.ID# 5884 (applying exacting scrutiny because SORA affects fundamental right to parent). Plaintiffs contend that SORA also implicates registrants' fundamental right to travel and work. First Amended Complaint, Doc. 46, Pg.ID# 870-73, 874-77, 896-97. Facial invalidation does not turn, however, on this Court's conclusions about SORA's impact on constitutional rights. While impact on constitutionally protected rights is a sufficient criterion for facial invalidation, it is not a necessary one. *Springfield Armory*, 29 F.3d at 254.

infringes on constitutionally protected rights); *Kolender*, 461 U.S. at 358 n.8 (facial challenge is permitted if law imposes criminal penalties, and reaches a substantial amount of constitutionally protected conduct); *Belle Maer Harbor*, 170 F.3d at 557 ("even in cases not involving First Amendment rights, we have recognized that courts may engage in facial analysis where the enactment imposes criminal sanctions"); *Peoples Rights Org.*, 152 F.3d at 533-34 (in deciding whether a vague law is subject to facial invalidation, court should look to nature of enactment, including whether "criminal penalties are at stake" and "whether the statute contains a scienter requirement"); *Springfield Armory*, 29 F.3d at 252 ("a criminal statute may be facially invalid even if it has some conceivable application").

Accordingly, the district court's decision should be affirmed not only on the basis that those provisions are unconstitutional as applied, but also because they are unconstitutional on their face.

## CONCLUSION

The district court's injunctions should be affirmed, and this Court should hold that the SORA provisions at issue are facially invalid.

Respectfully submitted,

s/Miriam Aukerman
Miriam Aukerman (P63165)

s/William W. Swor
William W. Swor (P21215)

s/Paul Reingold
Paul Reingold (P27594)

Attorneys for Plaintiffs-Appellees
Dated: September 23, 2015

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the word counting feature of counsel's word processing programs shows that this brief contains 13,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(A)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

*s/ Miriam Aukerman*
Miriam Aukerman (P63165)
Attorney for Appellees

## CERTIFICATE OF SERVICE

I certify that on September 23, 2015, I served this brief on all counsel of record via the Court's ECF system.

*s/ Miriam Aukerman*
Miriam Aukerman (P63165)
Attorney for Appellees

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Description of the Document | Date | District Court Record Entry Number | Page ID Numbers |
|---|---|---|---|
| Order Granting Motion to Proceed Anonymously | 4/18/2012 | RE 11 | 231 – 235 |
| Stipulated Protective Order | 5/1/2012 | RE 16 | 316 – 318 |
| Opinion and Order | 3/18/2013 | RE 27 | 669 – 704 |
| Plaintiffs' First Amended Complaint | 12/2/2013 | RE 46 | 840 – 913 |
| Joint Statement of Facts | 6/27/2014 | RE 90 | 3723 – 3991 |
| Index of Exhibits | 6/27/2014 | RE 90-1 | 3992 – 3997 |
| EX 1: Deposition of John Doe #1 | 6/27/2014 | RE 90-2 | 3998 – 4027 |
| EX 2: Deposition of John Doe #2 | 6/27/2014 | RE 90-3 | 4028 – 4063 |
| EX 3: Deposition of John Doe #3 | 6/27/2014 | RE 90-4 | 4064 – 4093 |
| EX 4: Deposition of John Doe #4 | 6/27/2014 | RE 90-5 | 4094 – 4122 |
| EX 5: Deposition of John Doe #5 | 6/27/2014 | RE 90-6 | 4123 – 4144 |
| EX 6: Deposition of Mary Doe | 6/27/2014 | RE 90-7 | 4145 – 4175 |
| EX 7: Deposition of I.G. | 6/27/2014 | RE 90-8 | 4176 – 4202 |
| EX 8: Deposition of S.F. | 6/27/2014 | RE 90-9 | 4203 – 4218 |
| EX 9: Deposition of Jill Levenson | 6/27/2014 | RE 90-10 | 4219 – 4259 |

| | | | |
|---|---|---|---|
| EX 10: Deposition of James Prescott | 6/27/2014 | RE 90-11 | 4260 – 4290 |
| EX 11: Deposition of Peter Wagner | 6/27/2014 | RE 90-12 | 4291 – 4311 |
| EX 12: Deposition of Janet Faye-Dumaine | 6/27/2014 | RE 90-13 | 4312 – 4341 |
| EX 13: Deposition of Richard Stapleton | 6/27/2014 | RE 90-14 | 4342 – 4369 |
| EX 14: Deposition of Timothy Poxson | 6/27/2014 | RE 90-15 | 4370 – 4388 |
| EX 15: 1st and 2nd Depositions of Karen Johnson | 6/27/2014 | RE 90-16 | 4389 – 4477 |
| EX 16: Deposition of Timothy Burchell | 6/27/2014 | RE 90-17 | 4478 – 4500 |
| EX 17: Deposition of Bruce Payne | 6/27/2014 | RE 90-18 | 4501 – 4532 |
| EX 18: Deposition of Leslie Wagner | 6/27/2014 | RE 90-19 | 4533 – 4550 |
| EX 19: Deposition of Chris Hawkins | 6/27/2014 | RE 90-20 | 4551 – 4574 |
| EX 20: Deposition of Anne Yantus | 6/27/2014 | RE 90-21 | 4575 – 4586 |
| EX 21: Deposition of Herbert Tanner | 6/27/2014 | RE 90-22 | 4587 – 4611 |
| EX 22: Expert Report of Dr. James J. Prescott | 6/27/2014 | RE 90-23 | 4612 – 4640 |
| EX 23: Expert Report of Dr. Jill Levenson | 6/27/2014 | RE 90-24 | 4641 – 4681 |
| EX 24: Expert Report of Dr. Janet Faye-Dumaine | 6/27/2014 | RE 90-25 | 4682 – 4696 |
| EX 25: First Expert Report of Peter | 6/27/2014 | RE 91-1 | 4703 – 4724 |

| | | | |
|---|---|---|---|
| Wagner | | | |
| EX 26: Second Expert Report of Peter Wagner | 6/27/2014 | RE 91-2 | 4725 – 4771 |
| EX 27: Expert Report of Anne Yantus | 6/27/2014 | RE 91-3 | 4772 – 4774 |
| EX 28: Expert Report of Richard Stapleton | 6/27/2014 | RE 91-4 | 4775 – 4789 |
| EX 29: 2nd Declaration of John Doe #5 | 6/27/2014 | RE 91-5 | 4790 – 4791 |
| EX 30: 2nd Declaration of Mary Doe | 6/27/2014 | RE 91-6 | 4792 – 4794 |
| EX 31: Amended Declaration of I.G. | 6/27/2014 | RE 91-7 | 4795 – 4796 |
| EX 32: Declaration of Timothy Poxson | 6/27/2014 | RE 91-8 | 4797 – 4807 |
| EX 33: Declaration of Joseph Granzotto | 6/27/2014 | RE 91-9 | 4808 – 4821 |
| EX 34: Summary of Obligations, Disabilities, and Restraints Imposed by SORA 2013 | 6/27/2014 | RE 91-10 | 4822 – 4836 |
| EX 35: Plaintiffs' Response to Defendants' Interrogatory 11 | 6/27/2014 | RE 91-11 | 4837 – 4844 |
| EX 36: Interrogatory Responses, John Doe #1 | 6/27/2014 | RE 91-12 | 4845 – 4850 |
| EX 37: Interrogatory Responses, John Doe #2 | 6/27/2014 | RE 91-13 | 4851 – 4857 |
| EX 38: Interrogatory Responses, John Doe #3 | 6/27/2014 | RE 91-14 | 4858 – 4864 |

| | | | |
|---|---|---|---|
| EX 39: Interrogatory Responses, John Doe #4 | 6/27/2014 | RE 91-15 | 4865 – 4870 |
| EX 40: Interrogatory Responses, John Doe #5 | 6/27/2014 | RE 91-16 | 4871 – 4875 |
| EX 41: Interrogatory Responses, Mary Doe | 6/27/2014 | RE 91-17 | 4876 – 4881 |
| EX 42: Defs' Response to Pls' 1st Interrogatories | 6/27/2014 | RE 91-18 | 4882 – 4888 |
| EX 43: Defs' Supplemental Resps to Pls' 1st Interrogatories & RFPs | 6/27/2014 | RE 91-19 | 4889 – 4895 |
| EX 44: Def's Answers to Pls' 1st Request for Admissions | 6/27/2014 | RE 91-20 | 4896 – 4902 |
| EX 45: MSP SORA Charging Data | 6/27/2014 | RE 91-21 | 4903 – 4905 |
| EX 46: MSP SORA Conviction Data | 6/27/2014 | RE 91-22 | 4906 – 4908 |
| EX 47: MSP Official Order | 6/27/2014 | RE 91-23 | 4909 – 4912 |
| EX 48: Tier Notification Letters | 6/27/2014 | RE 91-24 | 4913 – 4926 |
| EX 49: SOR Unit Student Safety Zone Cheatsheet | 6/27/2014 | RE 91-25 | 4927 – 4929 |
| EX 50: Offender Watch User Manual | 6/27/2014 | RE 91-26 | 4930 – 4943 |
| Joint Statement of Facts | 6/27/2014 | RE 92 | 4944 – 4949 |
| EX 51: Offender Watch Express Description | 6/27/2014 | RE 92-1 | 4950 – 4951 |
| EX 52: Offender Watch Contract | 6/27/2014 | RE 92-2 | 4952 – 4958 |

| | | | |
|---|---|---|---|
| EX 53: Total Number on SOR by Year | 6/27/2014 | RE 92-3 | 4959 – 4960 |
| EX 54: Total Number on SOR by Tier | 6/27/2014 | RE 92-4 | 4961 – 4962 |
| EX 55: Roster of MSP/SOR Unit Staff | 6/27/2014 | RE 92-5 | 4963 – 4964 |
| EX 56: MSP List of SORA Coordinators | 6/27/2014 | RE 92-6 | 4965 – 4968 |
| EX 57: Sample SOR Letter to Registrant | 6/27/2014 | RE 92-7 | 4969 – 4970 |
| EX 58: MSP Sex Offender Registry and Enforcement Training Powerpoint 2011 | 6/27/2014 | RE 92-8 | 4971 – 5029 |
| EX 59: Herb Tanner Sex Offender Registry Training 2013 for Prosecutors | 6/27/2014 | RE 92-9 | 5030 – 5049 |
| EX 60: Herb Tanner Sex Offender Registry Training 2011 for Prosecutors | 6/27/2014 | RE 92-10 | 5050 – 5072 |
| EX 61: Registration length June/August 2011 | 6/27/2014 | RE 92-11 | 5073 – 5074 |
| EX 62: Explanation of Duties Form | 6/27/2014 | RE 92-12 | 5075 – 5077 |
| EX 63: Doe #2 MSP Criminal History Print-out | 6/27/2014 | RE 92-13 | 5078 – 5079 |
| EX 64: Doe #2 Public Sex Offender Registry Print-out | 6/27/2014 | RE 92-14 | 5080 – 5082 |
| EX 65:DD-214 Certificate of Release or Discharge from Active Duty | 6/27/2014 | RE 92-15 | 5083 – 5085 |
| EX 66: Affidavit of Victim in Case of Doe #2 | 6/27/2014 | RE 92-16 | 5086 – 5088 |

| | | | |
|---|---|---|---|
| EX 67: Fiscal Year 2015 SOR Unit Budget | 6/27/2014 | RE 92-17 | 5089 – 5090 |
| EX 68: Offender Watch Training Video, Disk 3, Part 1, Disk 4, Part 1 | 6/27/2014 | RE 92-18 | 5091 – 5094 |
| EX 69: ***Filed Under Seal*** | 6/27/2014 | RE 92-19 | 5095 |
| EX 70: ***Filed Under Seal*** | 6/27/2014 | RE 92-20 | 5096 |
| EX 71: Doe v. Thompson, Case No. 12-C-168 (Kan. Division 6, July 2013) | 6/27/2014 | RE 92-21 | 5097 – 5127 |
| EX 72: The National Conference of State Legislatures, Cost-Benefit Analyses of SORNA Implementation | 6/27/2014 | RE 92-22 | 5028 – 5130 |
| EX 73: California AWA Position Statement | 6/27/2014 | RE 92-23 | 5131 – 5135 |
| EX 74: Colorado AWA White Paper | 6/27/2014 | RE 92-24 | 5136 – 5158 |
| EX 75: Texas Study of Costs to Local Government of Implementing AWA | 6/27/2014 | RE 92-25 | 5159 – 5169 |
| EX 76: Senate Fiscal Agency Analysis for Senate Bill 221 | 6/27/2014 | RE 92-26 | 5170 – 5173 |
| EX 77: Pew Research Center, Most Popular Online Activities | 6/27/2014 | RE 92-27 | 5174 – 5178 |
| EX 78: Karl Hanson Study | 6/27/2014 | RE 93-1 | 5185 – 5207 |
| EX 79: Declaration of Karl Hanson | 6/27/2014 | RE 93-2 | 5208 – 5223 |
| EX 80: Sex Offender Sexual Recidivism Risk Levels Over Time | 6/27/2014 | RE 93-3 | 5224 – 5225 |

| | | | |
|---|---|---|---|
| EX 81: Collateral Damage: Family members of Registered Sex Offenders | 6/27/2014 | RE 93-4 | 5226 – 5243 |
| EX 82: DOJ Evaluation of Sex Offender Residency Restriction in MI & MO | 6/27/2014 | RE 93-5 | 5244 – 5258 |
| EX 83: SOR Unit Manual | 6/27/2014 | RE 93-6 | 5259 – 5303 |
| EX 84: Judgment of Sentence Form CC219b | 6/27/2014 | RE 93-7 | 5304 – 5305 |
| EX 85: Doe #2 Order Amending Probation | 6/27/2014 | RE 93-8 | 5306 – 5307 |
| EX 86: Doe #3 Order of Probation | 6/27/2014 | RE 93-9 | 5308 – 5309 |
| EX 87: MSP Memo re Operation Verify | 6/27/2014 | RE 93-10 | 5310 – 5311 |
| EX 88: Legislative Analysis of Public Act 542 (2002) | 6/27/2014 | RE 93-11 | 5312 – 5317 |
| EX 89: Regional Jail Feasibility Study | 6/27/2014 | RE 93-12 | 5318 – 5320 |
| EX 90: State of Michigan Prison Cost | 6/27/2014 | RE 93-13 | 5321 – 5322 |
| EX 91: SMART SORNA Substantial Compliance Jurisdictions | 6/27/2014 | RE 93-14 | 5323 – 5325 |
| EX 92: Legislative Services Bureau Report on SORA | 6/27/2014 | RE 93-15 | 5326 – 5337 |
| EX 93: MSP News Releases on Sweeps | 6/27/2014 | RE 93-16 | 5338 – 5341 |
| EX 94: Michigan Attonrey General Letter re Student Safety Zones | 6/27/2014 | RE 93-17 | 5342 – 5346 |

| | | | |
|---|---|---|---|
| EX 95: SMART Confirmations of Michigan's Substantial Compliance | 6/27/2014 | RE 93-18 | 5347 – 5355 |
| EX 96: Byrne Fund Reports 2011 | 6/27/2014 | RE 93-19 | 5356 – 5357 |
| EX 97: Michigan Senate Bills 76 & 77 | 6/27/2014 | RE 93-20 | 5358 – 5366 |
| EX 98: Defendants' 2nd Supplemental Responses to Plaintiffs 1st Interrogatories & RFPs | 6/27/2014 | RE 93-21 | 5367 – 5376 |
| EX 99: Letter Announcing Offender Watch 10/24/13 | 6/27/2014 | RE 93-22 | 5377 – 5378 |
| EX 100: SMART Annual Implementation Review Letter 9/17/13 | 6/27/2014 | RE 93-23 | 5379 – 5381 |
| EX 101: John Doe #1 Requests to Admit | 6/27/2014 | RE 93-24 | 5382 – 5386 |
| EX 102: John Doe #2 Requests to Admit | 6/27/2014 | RE 93-25 | 5387 – 5391 |
| EX 103: John Doe #3 Requests to Admit | 6/27/2014 | RE 93-26 | 5392 – 5396 |
| EX 104: John Doe #4 Requests to Admit | 6/27/2014 | RE 93-27 | 5397 – 5402 |
| EX 105: John Doe #5 Requests to Admit | 6/27/2014 | RE 93-28 | 5403 – 5407 |
| EX 106: Mary Doe Requests to Admit | 6/27/2014 | RE 93-29 | 5408 – 5411 |
| EX 107: SMART Letter 2/1/11 | 6/27/2014 | RE 93-30 | 5412 – 5414 |
| EX 108: Federal Register Vol. 73, No. 128, July 2, 2008 | 6/27/2014 | RE 93-31 | 5415 – 5457 |

| | | | |
|---|---|---|---|
| EX 109: Michigan Sex Offender Registration Legislative Recommendations | 6/27/2014 | RE 93-32 | 5458 – 5474 |
| EX 110: SMART Sex Offender Registration and Notification Checklist | 6/27/2014 | RE 93-33 | 5475 – 5497 |
| Joint Statement of Facts | 6/27/2014 | RE 94 | 5498 – 5503 |
| EX 111: SMART National Guidelines for Sex Offender Registration and Notification | 6/27/2014 | RE 94-1 | 5504 – 5564 |
| EX 112: House Fiscal Agency Analysis for SB 188, 189, & 206 | 6/27/2014 | RE 94-2 | 5565 – 5576 |
| EX 113: Public Sex Offender Registry (PSOR) Frequently Asked Questions | 6/27/2014 | RE 94-3 | 5577 – 5585 |
| EX 114: PAAM Outline of 2011 SORA Changes | 6/27/2014 | RE 94-4 | 5586 – 5597 |
| EX 115: SOR Unit Responses to ACLU | 6/27/2014 | RE 94-5 | 5598 – 5608 |
| EX 116: ACLU Dissection of Draft date 11/3/10 | 6/27/2014 | RE 94-6 | 5609 – 5619 |
| EX 117: Herb Tanner Sex Offender Registry Training 2009 for Prosecutors | 6/27/2014 | RE 94-7 | 5620 – 5627 |
| EX 118: Offender Watch Home Screen | 6/27/2014 | RE 94-8 | 5628 – 5629 |
| EX 119: Offender Watch Search Screen | 6/27/2014 | RE 94-9 | 5630 – 5631 |

| | | | |
|---|---|---|---|
| EX 120: Doe #2 Offender Watch | 6/27/2014 | RE 94-10 | 5632 – 5633 |
| EX 121: Offender Watch Non-Compliant Offender Search Results | 6/27/2014 | RE 94-11 | 5634 – 5636 |
| EX 122: Offender Watch Search Results from Specified Point | 6/27/2014 | RE 94-12 | 5637 – 5640 |
| EX 123: Offender Watch Individual Registrant Map | 6/27/2014 | RE 94-13 | 5641 – 5642 |
| EX 124: Offender Watch Registration for Email Alerts on Individuals | 6/27/2014 | RE 94-14 | 5643 – 5644 |
| EX 125: Offender Watch Registration for Email Alerts around Locations | 6/27/2014 | RE 94-15 | 5645 – 5646 |
| EX 126: MSP Annual Fee Letter dated March 2014 | 6/27/2014 | RE 94-16 | 5647 – 5649 |
| EX 127: Doe #1 Offender Watch Page | 6/27/2014 | RE 94-17 | 5650 – 5652 |
| EX 128: Declaration of Peter Wagner | 6/27/2014 | RE 94-18 | 5653 – 5657 |
| EX 69 & 70: *Filed under seal* | 6/27/2014 | RE 95 | *sealed* |
| Plaintiffs' Motion for Judgment | 6/27/2014 | RE 96 | 5669 – 5719 |
| Defendants' Response to Motion for Judgment | 7/9/2014 | RE 97 | 5720 – 5777 |
| Plaintiffs' Response to Defendants' Response to Motion for Judgment | 7/23/2014 | RE 99 | 5805 – 5842 |
| Defendants' Reply to Response re Motion for Judgment | 8/6/2014 | RE 100 | 5843 – 5864 |
| Opinion and Order on Rule 52 | 3/31/2015 | RE 103 | 5875 – 5947 |

| | | | |
|---|---|---|---|
| Motions | | | |
| Second Declaration of John Doe #4 | 8/17/2015 | RE 116 | 6011 – 6012 |